IN THE MATTER OF ERIC J. GAVEL, AN ATTORNEY-AT-LAW.

Argued June 25, 1956—Reargued September 5, 1956—Decided October 4, 1956.

*Mr. John B. Molineux,* by direction of the court, argued for the order to show cause.

*Mr. John J. Rafferty* argued in opposition to the order to show cause.

The opinion of the court was delivered by

VANDERBILT, C. J. Alex Kurpiewski, an illiterate Polish immigrant 66 years of age, filed charges against the respondent Eric J. Gavel, an attorney-at-law of Sayreville, Middlesex County, with the Ethics and Grievance Committee for Middlesex County. The charges were complicated. The committee heard 30 witnesses on seven different days, taking in all over 750 pages of testimony. Its presentment found the respondent guilty of unethical conduct not only in several respects alleged by the complainant but also with respect to acts not alleged in this complaint but disclosed by testimony taken before the committee.

The five-page typewritten brief submitted on behalf of the respondent prior to the oral argument last June and the oral argument itself were so inadequate that at the conclusion of the argument the court expressed from the bench

the need of a detailed brief and argument from the respondent and set the matter down for early argument this fall.

The second brief filed on behalf of the respondent, a typewritten affair of 12 pages, in opposition to the printed brief of the committee covering the situation fully, was no improvement on the first. It is, moreover, replete with admissions of the respondent's unethical conduct:

"* * * it would seem to have been the duty of respondent not only to urge upon Kurpiewski that he be represented by another attorney but, upon Kurpiewski declining to take such advice, respondent should have withdrawn entirely from the matter and should have required his father to obtain other counsel. The situation is aggravated by the failure of respondent to have the agreement between the parties reduced to writing and in specific detail, and this writing, at least, witnessed by an indifferent person. Respondent now admits his fault in this regard and makes respectful submission to this Honorable Court therein."

\* \* \* \* \* \* \* \*

"Respondent flatly testified:

'I inflated the purchase price. If you are going to dwell on the subject, rather than have you dwell any further, on the subject, there was an inflation of the purchase price in order to obtain initially the granting of a mortgage.' (*p.* 666–13)

The matter is not otherwise justified or defended."

\* \* \* \* \* \* \* \*

"* * * respondent would seem to be culpable in these respects, to wit:

(1) In not withdrawing from the matter when Kurpiewski was without other legal representation or independent advice especially in view of the fact that the kin and personal friends of respondent were involved in the transaction;

(2) In failing to have the whole arrangement between the parties reduced to writing; executed in the presence of and witnessed by an indifferent person; and

(3) In his improper handling of trust funds although it does not appear that loss occurred to anyone thereby."

The findings of the committee and of the court, of course, go beyond the concessions of the respondent.

Before the reargument this fall the court had been advised that the complainant and his wife had brought a civil suit against the respondent and his wife in the Chancery Division of the Superior Court for an accounting as his attorney on the same matters mentioned in the presentment here, and

that the respondent had settled the suit for substantially the same amount involved in the proceedings here. The settlement involved a turning over to the complainant of $4,045 in cash and the assignment to him of two mortgages obtained by the respondent and his wife as a result of the sale of properties of the complainant on which there is due an approximate unpaid balance of $4,200. Neither the suit itself nor the settlement was mentioned in either brief of the respondent or at the first argument. When queried concerning it by this court at the opening of the reargument, his counsel said the respondent had first told him of the suit and the settlement that morning and asked leave to withdraw from the case. When this court asked the respondent why he had not disclosed the facts to his counsel or this court, his only reply was that he was tired of hearing about the matter—a strange attitude indeed to be taken by an officer of the court seeking to maintain his standing at the bar. We gave the respondent the choice of engaging new counsel, arguing the matter himself, or submitting it on the record including the parts of the civil suit and its settlement. He elected to submit. It may be contended that settlement of a civil obligation does not of itself carry with it proof of guilt in a disciplinary proceeding, but when the amount of the settlement is comparable to the full amount sought by the complainant, and the facts of the suit and of the settlement are not revealed in circumstances which called for their frank disclosure and an absurd reason is offered for the concealment, the inferences against the innocence of the respondent are most compelling.

The respondent's deviousness, however, first appeared much earlier in the proceedings. In his testimony at the hearings before the committee this respondent took a position diametrically opposed to that taken in his five-page sworn answer, an answer which his counsel characterizes as "almost *pro forma*." Either his answer or the testimony must not only be untrue but false.

We cannot, however, rest our decisions on these general observations, even though they dictate our conclusions. We

are driven to the tedious task of analyzing the voluminous record of an involved factual situation to ascertain, first, the facts that appear to be beyond question; second, the accusations of the complainant and the explanation of the respondent attorney; and third, our views and the disposition of the matter.

## I.

The complainant Alex Kurpiewski was the owner of six parcels of real estate in South Amboy and Sayreville, all of which were covered by a blanket mortgage held by the South Amboy Trust Company. He had lost the job which he had held for 42 years; he was behind in his mortgage payments; his taxes were delinquent and he was otherwise in financial difficulties and threatened with the loss of his home and small tavern business through foreclosure. In all, his total indebtedness was approximately $17,500.

In this situation he sought help. He wanted a lawyer, but not from South Amboy, where he lived. Prior to July or August 1954 Kurpiewski and Eric J. Gavel were personally unacquainted with each other. Kurpiewski approached John Gavel, the respondent's uncle, in the summer of 1954, and after a self-introduction told John Gavel that he was looking for a lawyer. Kurpiewski had indicated an acquaintance with several of John Gavel's employees and presumably he knew that John's nephew was a lawyer, for he sought an introduction with the respondent through the uncle. Kurpiewski's initial need for legal assistance was in connection with a claim for wrongful discharge from employment. Kurpiewski also came to know the respondent's father, Joseph Gavel, an inactive real estate broker and the proprietor of a gas station in Sayreville, and Chester Weiss, a young man who had been raised from boyhood in the Gavel household and who was at times an employee of John Gavel.

A great deal of discussion ensued in the days and weeks that followed the initial introduction of Kurpiewski to the Gavel family, most of which involved Kurpiewski's desire to get out from under the heavy burden of his financial

troubles and at least save his "saloon" property and his "homestead," two of the six properties covered by the blanket mortgage on which he was in default, and there is no doubt that he wanted to sell the four remaining properties or that when he later signed deeds that he knew he was selling them. These discussions led to the preparation by the respondent of a formal contract of sale of the four properties in question from Kurpiewski to Chester Weiss for $17,500. This document dated November 29, 1954, was signed by Kurpiewski in the presence of the respondent's secretary, but it was never signed by Weiss. Strangely, there are no other agreements in writing covering the sale or other arrangements finally made by Kurpiewski concerning these four properties. On December 3, 1954 Kurpiewski and his wife executed deeds conveying these four parcels to Margaret Gavel, the respondent's wife, and on December 9, 1954 she executed mortgages covering each of these parcels in the total amount of $17,500 to the First National Bank of Sayreville, in which act she was of necessity joined by her husband. All of the documents, the four deeds and four mortgages, were recorded simultaneously on December 17, 1954.

On November 23, 1954, prior to the date of the proposed contract with Chester Weiss, the respondent had filed four separate applications for mortgage loans on these parcels, representing to the First National Bank of Sayreville that the total purchase prices to be paid for these four parcels was $30,250. By the respondent's own admission he intentionally misrepresented the facts in order to obtain the mortgages of $17,500, since the bank regulations did not permit mortgages in excess of 60% of the value of the properties. With the mortgage money so procured the respondent arranged for the satisfaction of the South Amboy Trust Company's blanket mortgage and the tax liens on all the properties and paid the debts of Kurpiewski, disbursing in all about $17,800.

Thereafter, between March and August 1955 the respondent and his wife sold the four properties in question to four separate purchasers for sales prices totaling $28,350. Two

of these transactions merit review. In one transaction premises located at 323 Parker Avenue, South Amboy, were sold to Paul E. White for $6,000. This purchaser was able to obtain a mortgage from a savings and loan association for the full amount of his purchase price due to the fact that it was misrepresented to the mortgagee and others interested in the security for this loan that the purchase price was $6,500, and that $500 had been paid in cash on the signing of the contract. The admitted fact is that no such payment was made and it appears that the respondent knew of the misrepresentation and made no objection to closing the deal on that basis. The deed from Margaret Gavel to Paul E. White contains $7.15 in United States documentary stamps, the amount required on a purchase price of $6,500 and customarily affixed by the seller.

In the other of these transactions, involving 333 Midland Avenue, Sayreville, the premises were sold to Thomas Seig for $6,500. In order to facilitate the sale, the respondent attempted to obtain a mortgage loan for the purchaser from the First National Bank of South Amboy. An officer of the bank inspected the property and advised the respondent that because of the bad physical condition of the premises the bank would not make a direct mortgage loan to the purchasers. The bank would, however, make a collateral loan to the respondent and his wife personally, to be secured by an assignment of an existing mortgage taken by Gavel and his wife. The bank insisted, however, that even in these circumstances, although the loan would primarily be upon the financial responsibility of the respondent and his wife, it would insist that certain repairs be made immediately or the loan would be called. Seig had agreed to purchase this property for $6,500 in December 1954, and although there was no written purchase agreement he had firmly believed that he was in possession of the premises, not as a tenant but under his agreement to purchase. He understood that the respondent was attempting to obtain a mortgage for him. He made payments amounting to $775 between December 1954 and the closing to Gavel, which were credited against

his purchase price. Finally he received word in August 1955 from Samuel Cohen, a member of the bar by whom the respondent had previously been employed, that the deal was ready to close, Gavel allegedly being away at the time. From all apparent indications the sale went through as one for $10,000. Mr. and Mrs. Seig executed a mortgage in that amount to Gavel's wife and received in exchange a deed from Mrs. Gavel and the respondent. This mortgage was concurrently assigned to the First National Bank of South Amboy as security for a $5,000 personal loan made by Gavel and his wife. The bank obtained from Gavel and from Mr. Seig a written certification of the fact that $10,000 was due on the mortgage so assigned. Seig made his payments due under his mortgage to Mrs. Gavel directly to the bank from which Gavel had procured the personal loan. There was no written contract or memorandum between the parties, but the purchaser's understanding was that he had purchased the premises for $6,500 and that he was to make certain repairs to the house, but in no circumstances was he to be obligated to pay $10,000 for the house even if he never made the repairs. He understood fully that he was executing a mortgage for $10,000, but he had been assured by Gavel, whom he trusted, that a credit of $3,500 would be allowed on the mortgage when the repairs which they had discussed were made. There was no written record or understanding as to the nature or the extent of the repairs to be made by Seig.

With all of the properties now sold there was an admitted profit of $7,750 over and above the disbursements made to satisfy the financial obligations of Kurpiewski, the expenses of the sales and some alleged repairs to the premises. The profit was in the form of cash and mortgages, none of which was ever turned over to Kurpiewski.

After the transfer of the four properties from Kurpiewski to the respondent's wife and the removal of the lien of the blanket mortgage from the "homestead" and "saloon" property retained by Kurpiewski, the respondent, on behalf of Kurpiewski and in his own handwriting, filled out a mortgage

application to the First National Bank of Sayreville seeking a loan on the "homestead" at 343 Parker Avenue, South Amboy. The application was signed by Kurpiewski and it represented to the bank that the purpose of the loan was to make "alterations and repairs" to these premises. The respondent admittedly knew that this was an inaccurate representation and that the money was to be used in substantial part for purposes other than as represented. As a result of this application on February 25, 1955 Kurpiewski received a new mortgage loan of $5,000 on this property. The check representing the mortgage fund was made payable to Kurpiewski and his wife and was apparently endorsed by them under the legend "deposit only to the account of Eric J. Gavel." At this time Kurpiewski was interested in purchasing another tavern business and Gavel had already advanced $1,000 as the down-payment. This mortgage check was deposited in the respondent's "attorneys" account which was an account separate from a personal account maintained by the respondent in the Sayreville bank. Out of this fund the respondent made various disbursements on behalf of Kurpiewski, including the repayment to himself of the $1,000 loaned for the down payment mentioned. In all, these amounted to $3,594.93, leaving a balance due Kurpiewski of $1,445.07. This amount was never turned over to him. Two months after the hearings in this proceeding had started, this fund was found by the committee, pursuant to the invitation of the respondent, in an envelope in the safe of the respondent's father.

There is clear proof from the records of the respondent that during the period of time he held these trust funds he had used a substantial portion of them for purposes other than for Kurpiewski's benefit. He admittedly commingled his own personal funds with the funds in this trust account, and at one point during the period that he held this fund his trust account had been overdrawn by the sum of $3,508.27. On March 31, 1955 the balance in this trust account was $1,169.19, which was considerably less than the $1,445.07 admittedly due to Kurpiewski. Moreover, on this date more

than that amount was due because some of the disbursements made for Kurpiewski's account were made after that date.

The overdrawing of his checking accounts seems to have been the rule rather than the exception to the respondent. In a little more than a year he had overdrawn his personal account 45 times and the trust account 13 times. The respondent's attitude was that all of his accounts, trust and otherwise, should be treated as one for the purposes of determining his credit balance. As one of the officers of the bank testified:

"* * * the only time Mr. Gavel and I really argued was about overdrafts, and the point was that he said that as long as he had funds in the bank regardless of what account they were in, that he defied me to send a check back. Whether they were in the savings account, or what account they were in, as long as there were funds in the bank, he wanted it understood that any account could be charged to credit the other account."

The $1,000 loaned by the respondent to Kurpiewski came from the attorney's account. Allegedly there were sufficient "personal" funds in that account to cover. In repaying this sum to himself after the $5,000 mortgage proceeds had been received, the respondent drew a check on the attorney's account "for something in the vicinity of $400" and took the balance in cash by holding out moneys from cash sums entrusted to him in other unrelated transactions and only depositing a portion of such total fund.

## II.

The gist of the charges made by Kurpiewski were that the respondent persuaded him to convey the four parcels in the belief that they were to be sold for not less than $23,000 and were in fact being sold to speculators in Newark for that sum, and that he was to receive the difference between the selling price and the amount of his total indebtedness and was to hold his "saloon" and "homestead" free and clear; that instead of selling these properties, and without Kurpiewski's knowledge, the respondent arranged for the conveyance

of the four parcels to his own wife, Margaret Gavel, refinanced them to pay Kurpiewski's debts and then resold them at a substantial profit which the respondent retained. Kurpiewski also charged that, without his knowledge, Gavel persuaded him to mortgage his "homestead" property and without authorization deposited the mortgage fund to his own account and misappropriated a portion of it to his own use; that Gavel obtained a deposit on the sale of the "saloon" property and misappropriated all or part of it; that Gavel had failed and neglected after repeated demands to disburse sufficient of the moneys belonging to Kurpiewski to enable him to renew the liquor license on the tavern and jeopardized the renewal of the license; and that when he tried to get an accounting of the transactions, the respondent avoided him.

The respondent denied the charges and in his affidavit answering the complaint set forth that he himself took over the properties and paid the debts and that there never was any agreement to pay over any money above and beyond the debts.

At the hearing the testimony offered in explanation of the basic transaction was totally inconsistent with that set forth in the sworn answer. Through the testimony the respondent took the position that he himself was not interested in the deal but that it was his father, his uncle and Chester Weiss that had jointly agreed to take the properties over upon an offer made by Kurpiewski to them to convey his four properties for the payment of the blanket mortgage, his taxes and debts, leaving him with his tavern and residence free and clear. The respondent asserted that the whole deal was nebulous and that title was taken in the name of his wife merely as a matter of convenience when his father had to go to Florida and because Kurpiewski's plight was becoming more and more serious and something had to be done fast if he was to be helped.

The deal was indeed nebulous. The testimony of the respondent's father, uncle John and of Chester Weiss indicates that they themselves did not understand the status of the alleged deal or know of the existence of any alleged joint

venture. Uncle John testified that he did not accept or reject any proposition; he considered that the respondent's father had first choice and had accepted the offer. The essence of Weiss' testimony is that he understood that he was principal in the deal; that the Gavels were putting up the money as a "sort of loan"; that he was to "fix the places up" and they were all "to make something out of it"; but that as far as he knew none of the others were "going to have a piece of the deal." On the other hand, the elder Gavel testified that if there was any profit "it would be between John and I." Later he testified he was to get all the profit himself, then finally he took the position that Weiss was entitled to a share of the profit if there was one, but that he didn't know what had been made, if anything, on the properties because his son, the respondent, had never accounted to him. The respondent, on the other hand, told of many discussions had with the joint venturers about the profit.

When the respondent was questioned in the preliminary investigation of this matter by the prosecutor appointed by this court he never disclosed that the alleged arrangement with Kurpiewski was in any way different from that set forth in his answering affidavit. When confronted with the inconsistency at the formal hearing and asked why he did not disclose in the answer the asserted interest of his father, uncle and Chester Weiss, the respondent explained:

"A. It didn't seem necessary. I made a complete revelation to Mr. Cohen, and Mr. Cohen—The ambiguity of the complaint, of the affidavit, of the complaint in itself, was such that we didn't know what to answer, how, where, when, or why, so we felt that the best thing to do would be to file some form of answer and ultimately explain the thing by way of testimony."

The respondent admitted before us the impropriety of his participation in the transaction with Kurpiewski. He has admitted fault for aggravating the situation by failing to reduce the agreements between the parties to writing. He has admitted that the answer filed by him was not entirely

true or candid. He has admitted mishandling the trust funds in his possession. He has admitted the misrepresentations made in the mortgage applications. He also agrees that some disciplinary' penalty should be imposed upon him for his misdeeds.

But, the respondent urges that considering the questionable credibility of the complainant, his honesty has not been successfully impugned and the most that has been proven against him are matters relating to his business acumen. In mitigation he pleads that he intended no deception by his answer and merely acted in accord with his mentor's advice; that no person suffered any damage as a result of the violation of the trust account; and that the banks to whom the misrepresentations were made knew the true facts.

The respondent's main defense is that the complainant is unworthy of credence. We agree with the committee that Kurpiewski was no paragon of consistency. His complaint goes beyond the bounds of the obvious facts. He has professed ignorance of incidents of which he obviously had knowledge and he has sworn to allegations void of any proof whatsoever. There is no excuse for his actions, for though illiterate he was not unaware of what was going on about him, and though ignorant he was not stupid. His testimony and conduct, therefore, are looked upon with skepticism. We agree with the findings of the committee that the respondent did not act without the knowledge and consent of Kurpiewski in obtaining the new mortgage for him on his homestead and in depositing the check for the proceeds in his attorney's account. We similarly find no truth to the charges that the respondent acted improperly in connection with any sale of or deposit on the "saloon" property, or that Gavel is to blame for any jeopardy to Kurpiewski's liquor license.

To exonerate himself from the complainant's charges, in view of the large amount of evidence of undoubted credibility produced before the committee, the respondent must rely on the probity of his own conduct, not on the infirmities of his accuser. We have reviewed the evidence in its entirety

and in reaching our conclusions we have considered only the respondent's own admissions and conduct and such testimony as is beyond any reasonable doubt, though the application of this test is not required in law. Applying this standard of test we cannot conclude that the testimony offered by the respondent substantiates even his joint venture story.

### III.

1. In *Stockton v. Ford,* 11 *How.* 232, 247, 52 *U. S.* 232, 247, 13 *L. Ed.* 676 (1850), Mr. Justice Nelson observed that:

"There are few of the business relations of life involving a higher trust and confidence than that of attorney and client, or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it."

An attorney in his relations with a client is bound to the highest degree of fidelity and good faith. The strongest influences of public policy require strict adherence to such a role of conduct. Since the relationship puts the attorney in a position to avail himself of the necessities of his client and to gain knowledge that can be used to the client's disadvantage, any transactions between attorney and client are presumptively invalid in law—a presumption that can be overcome by only the clearest and most convincing evidence showing full and complete disclosure of all facts known to the attorney and absolute independence of action on the part of the client, *In re Blake's Will* (*Beers v. McConnell*), 21 *N. J.* 50 (1956); *Alburger v. Crane, 5 N. J.* 573 (1950); *Crocheron v. Savage, 75 N. J. Eq.* 589 (*E. & A.* 1909); *Canon* 11.

We are certain that Kurpiewski sought the respondent's help as an attorney and that Gavel responded in that capacity. In the attorney-client relationship thus created Gavel was required to be absolutely frank and open with his client and

to disclose to him every fact of which he had knowledge that could in any way affect the determination of Kurpiewski to make the conveyance. If the true fact was that Gavel dealt with Kurpiewski on his own behalf, in addition to disclosing that fact he was also required to see that his client received independent guidance and advice or else received from him such advice and guidance as Gavel would have been expected to give had the transaction been with a stranger. On the other hand, if the true fact was that Gavel acted on behalf of his father and the others, in view of the close family relationship and the adverse character of their interest to Kurpiewski he was equally burdened by the same requirements. His conduct does not measure up to this standard.

There is no circumstance that can do more to debase the profession of law as a whole in the eyes of the public and deprive the profession of the full measure of public esteem that properly belongs to it than the prostitution of his trust by a lawyer. The dishonesty of which he is guilty in such an act is equally as condemnable from a moral standpoint as larceny. This respondent has by this and his other acts displayed an utter disregard for any standard of ethics save that which achieved his own selfish ends.

2. Moreover, as an attorney-at-law of this State he knew that the burden of proof was upon him as a fiduciary to establish clearly the absence of taint in his transactions. As the attorney proceeded against he certainly should have known that his burden was no less in these proceedings and that he was obliged to make not merely an answer to the specific allegations of the numbered paragraphs of the complaint but a full, candid and complete disclosure of all facts reasonably within the scope of the transactions set forth in the charges against him. *R. R.* 1:16–4 contemplates that after complaint and answer the committee shall have the opportunity to investigate informally and consider the charges made in the light of the explanation furnished by the attorney, and in the absence of any unprofessional or unethical conduct to dismiss the complaint. Any sophistry or half-truth or other

tactic which has as its purpose or effect the frustration of the disciplinary proceeding is deceitful and indefensible from an ethical standpoint and contrary to the spirit of the rules; compare *In re "X"*, 21 *N. J.* 281 (1956), where the committee made a point of finding that its work had been aided by the complete and honest disclosure by the attorney and by his total cooperation. If the true facts were as the testimony of the respondent and his friends purported to portray, it would clearly appear that the answer made to the complaint was actually a false statement of the facts and highly improper. Its only purpose could have been to deceive the committee and withhold from it the full explanation until the respondent could determine the state of the case against him. His preliminary conferences with the prosecutor acting on behalf of the court furthered the deception and gave no hint of any other version than that already claimed. On the other hand, another possible inference is that the answer is true and the testimony is an ill-devised fabrication to aid the respondent. Only one of the versions can be true. The explanation of the respondent we frankly do not believe. Aside from the perjurious connotations of his acts, the respondent has exhibited his total lack of good character and integrity.

3. As we proceed to consider the other charges against this attorney we find only further justification for our conclusions.

*Canon* 11 of the *Canons of Professional Ethics* provides in part that:

"Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not *under any circumstances* be commingled with his own or be used by him." (Emphasis supplied)

The funds in the hands of an attorney that belong to a client or others must be kept inviolate. For obvious reasons, the strictest rules of conduct apply here and every presumption works against the wrongful user. We find little merit

in the plea by the respondent that no one suffered as a result of his wrongful acts. This may indeed have been the result of fortuitous circumstances.

4. There is other conduct of the respondent violative of *Canon* 11 which is equally reprehensible. He failed in his duty to account promptly to his client and to remit any balance due him. The circumstances surrounding the holding of the cash are most suspicious and there is absolutely no excuse for his failure to account after demand.

5. In addition to the duties and obligations of an attorney to his client, he is responsible to the courts, to the profession of the law, and to the public, *In re Genser,* 15 *N. J.* 600 (1954); *In re Howell,* 10 *N. J.* 139 (1952). He is bound even in the absence of the attorney-client relation to a more rigid standard of conduct than required of laymen. To the public he is a lawyer whether he acts in a representative capacity or otherwise. In *In re Genser, supra,* 15 *N. J.* 600, 606 (1954), we held that:

"The fiduciary obligation of a lawyer applies to persons who, although not strictly clients, he has or should have reason to believe rely on him. *Drinker, Legal Ethics* (1953), *p.* 92."

And in *In re Howell, supra,* 10 *N. J.* 139, 140 (1952), we approved of the doctrine that any conduct:

"* * * of such a nature as to engender disrespect for the law which is his basic trust"

can be made the subject for disciplinary action. Still more recently in *In re Carlsen,* 17 *N. J.* 338, 346 (1946), we pointed out that in their relations with others attorneys:

"* * * must carry with them their elemental obligations of honesty, uprightness and fair dealing; the contrary view would grossly discredit our legal institutions and has been rightly rejected by courts throughout the country."

These are the controlling principles which should have been the lodestar guiding the actions of this respondent. His

acts of misrepresentation to the mortgagee banks and his unconscionable arrangement with respect to the Seig mortgage show how far he strayed from course of conduct required of him. It is obvious from the record that Seig never knew the exact nature of the transaction that had been devised to enable the respondent to close the deal on this property. That Seig suffered no injury as a result is no answer. What would have been the circumstances if, the repairs not having been satisfactorily completed, the bank called its loan to Gavel? Would he not then have turned on Seig? Seig placed a great confidence in the respondent and the respondent took rather extreme advantage of his position.

6. The respondent had it within his power to document the entire understanding of the transactions with Kurpiewski and with the others with whom he dealt, but instead he chose to proceed without the benefit of written agreements or memoranda. He knew of the attitude of Kurpiewski toward the other attorneys who had represented him in the past and should have recognized, if his purposes were honest, that informality could result only in trouble that would affect not only himself but reflect upon the entire profession.

 Good character is an essential qualification for admission of an attorney to our bar, and whenever by his conduct an attorney exhibits that he ceases to possess this quality it is our duty to withdraw our endorsement, *In re Young,* 75 *N. J. L.* 83 (*Sup. Ct.* 1907); *In re Hansen,* 101 *Mont.* 490, 54 *P. 2d* 882 (*Sup. Ct.* 1936); 7 *C. J. S., Attorney and Client,* § 20, *p.* 735. The wanton disregard by the respondent for truth and honesty and of the duty owed by him to the profession and the public, we can attribute only to his lack of moral fiber. His acts are not merely discreditable; they are dishonorable. Time and circumstances have fortunately saved those with whom he dealt from substantial loss. The amount of punishment due the respondent should not be gauged by the damages suffered. The controlling consideration is, should the respondent be further trusted with the powers of an attorney and the reputation of the profession?

█ In our judgment the entire course of conduct of the respondent in this matter is such as to call for disbarment.

*For disbarment*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING, JACOBS and BRENNAN—5.

*For two years' suspension*—Justices HEHER and WACHENFELD—2.