IN THE MATTER OF ANTHONY R. LA DUCA, AN ATTORNEY-AT-LAW.

Argued November 21, 1972—Decided January 23, 1973.

134

*Mr. Howard Stern* argued the cause for Passaic County Ethics Committee.

*Mr. Richard M. Glassner* argued the cause for respondent.

PER CURIAM. Respondent was admitted to the bar of this State in 1961. Following a jury trial in the United States District Court for the Southern District of New York he

was convicted in April 1971 on two counts of a three-count indictment. The first count charged him and a co-defendant, a law partner of his, with conspiring with an unknown third person to sell and dispose of certain stolen property in the course of interstate commerce, knowing the property to have been stolen, in violation of 18 *U. S. C.* §§ 2314 and 2315. The second count charged respondent with perjury in sworn testimony before a federal grand jury investigating the matter. The co-defendant was acquitted. Respondent was sentenced to concurrent terms of imprisonment for one year on each count. There was an affirmance on appeal (without opinion) and a denial of certiorari by the United States Supreme Court.

At the trial respondent did not testify, electing to rest his defense on the testimony he gave before the federal grand jury investigating the matter, the transcript thereof having been adduced in evidence at the instance of the Government.

The Passaic County Ethics Committee conducted a hearing on the disciplinary aspects of the foregoing prosecution, and respondent there testified as to his version of the transactions in question and was cross-questioned by the Committee. The Committee also heard testimony from Mr. D., a former member of the Committee. See *infra.* Thereafter the Committee filed a presentment with this court. This sets forth that it was respondent's position that the Committee should reevaluate the merits of respondent's guilt of the charges of which he was convicted, on the record of the trial; that his conduct was not as an attorney but as an agent of another merely seeking to ascertain whether a reward was available for the return of stolen goods innocently discovered; and that in mitigation the Committee should consider (a) that respondent prejudiced his criminal case by *following improvident advice not to take the stand at the trial* and (b) that in doing what he was convicted for on the first count he relied on advice by Mr. D.

The Committee found that the trial record submitted on the appeal was not sufficiently complete to enable it to de-

termine respondent's guilt; but that the accusations against him involved serious violations of the law even if they did not relate to his professional conduct. The Committee concluded with a recommendation that the disciplinary penalty be less than disbarment for the reasons that there was no prior blemish on respondent's record and that he had been punished adequately for his "ill-considered and unwise action" by his conviction and imprisonment and the suffering of his family in consequence thereof.

Neither an Ethics Committee nor this Court reviews the truth of a criminal conviction in a disciplinary proceeding based upon the fact of a conviction. It may be appropriate in a given case to look at the underlying facts involved in the criminal charge to weigh the impact of the conviction upon the measure of discipline but in that process the fact of guilt will not be retried. *In re Mischlich,* 60 *N. J.* 590, 592–593 (1960). We will here advert to the facts, not to rerun the criminal convictions, but to see whether some amelioration may be found in the claim before the committee that respondent acted pursuant to advice sought and accepted in good faith from Mr. D. *Id.* at 593. If his claim in that regard were true, it would not reduce the impact of the convictions for perjury. In any event, an examination of the record reveals that respondent did not inform Mr. D. truthfully with respect to the role he had in mind and that respondent did not abide by the advice he received from Mr. D. The examination of the record, made to the end we have stated, satisfies us fully that respondent has been guilty of dishonest and immoral conduct of a nature which stamps him as unfit to continue on the roll of the members of the bar. His conduct cannot be passed off as merely "ill-considered and unwise."

From all the evidence we find the following. In January 1970 respondent came in contact with an individual, of whose identity no one can be confident from the record of this case, who was seeking a reward for return of certain

goods he had allegedly discovered. This person apprised respondent of his possession of 30 valuable porcelain art objects, apparently stolen, and he besought respondent's assistance in obtaining a reward from their owner. During his negotiations and communications hereinafter detailed respondent kept the name of the person secret, referring to him only as a "client." But ultimately, before the federal grand jury in October 1970, he purported to name the client, who he said had died in April 1970. He also later claimed that an intermediary, whom he had previously represented in certain matters, had put him in touch with the client.

Respondent told Mr. D. and others that his client had told him that the porcelain objects had been found among the effects of a deceased relative, along with a news clipping indicating they had been stolen from an Antique Porcelain Company in New York. A different version given by respondent at one time was that the client, after finding the objects, had engaged a private investigator who informed him as to the identity of the owner, and that the client had turned to respondent to ascertain whether there was a reward because the investigator was too expensive. Ultimately, according to respondent, he agreed with the client on an arrangement of a fee of $1,000 or 10% of the proceeds if a reward were realized. Soon thereafter the intermediary or the client came to respondent's office and showed him one or two of the porcelains.

Shortly after he was approached on the matter respondent consulted with Mr. D., who respondent thought was still on the Ethics Committee, purportedly to seek advice as to whether it would be ethical to undertake the assignment. D. told him that in his opinion there would be no objection to his merely ascertaining whether a reward was available, reporting that fact to the "client" and then immediately "stepping out of the case." But his opinion was conditioned on respondent first getting a sworn statement from the

client and reporting the facts to the police. Respondent never did either.[1]

About January 16, 1970 respondent phoned one McGraw, a representative of Toplis and Harding, independent adjusters for Lloyds of London, and told him he had a client who was in possession of antique porcelain objects which he believed had been stolen from the Antique Porcelain Company of New York. Respondent said the objects were worth a quarter of a million dollars and the client was looking for a reward. McGraw referred respondent to a Mr. Hans Weinberg, the principal of the Antique Porcelain Company. Soon thereafter respondent and his law partner called on Weinberg in Manhattan. Weinberg's company had sustained a loss by theft of 30 porcelain art objects in 1966 and had been paid by Lloyds of London the sum of $75,000 with the understanding that if the articles were ever restored to him in good condition he would repay that sum to the insurer without interest. By 1970, according to Weinberg, the items in good condition would be worth "at least $160,000.00."

Respondent told Weinberg essentially the same story he had told McGraw. When he described the specimen or specimens he had seen, Weinberg thought the whole lot of 30 could well be his, and he asked for photographs of all. He suggested that a reward in the form of a $7,500 check might be arranged if the articles were genuine. Respondent did not think that sum would be sufficient to satisfy his client and said that in any case it would have to be cash. Weinberg testified that respondent "was very much interested that we should buy the goods from his client * * * the whole purpose of his coming to us [was] to arrange that we should pay for the goods." Shortly afterwards respondent sent Weinberg photos of all the art objects, and these con-

---

[1] D. would have been better advised to tell respondent to advise the client to turn the goods over to the authorities, and to have nothing more to do with the matter himself.

vinced Weinberg that the porcelains were indeed the same lot which had been stolen from his store. He at once put respondent in touch with a Mr. Chapman, a security consultant for Lloyds of London, and also informed the police of the visit.

Respondent phoned Chapman and repeated the account of his unnamed client having found the porcelains in a box among the effects of a deceased relative; and he said that the client felt he was entitled to a reward but would not be satisfied with the $7,500 offered by Weinberg. They arranged to meet in person, and at that meeting there were extensive discussions concerning the mechanics of exchanging the goods for money should a mutually satisfactory figure be agreed upon. Chapman said each item or lot of items would have to be turned over to him individually for inspection as to identity and condition before any payment could be made for it. Chapman may have raised the offer to $10,000, but this is not clear. Respondent was to take these terms up with the client, but on the question of price he insisted that $7,500 would not do; the client wanted in the neighborhood of $35,000. The negotiators parted with the understanding that respondent was to consult with his principal again and report back to Chapman. Respondent phoned Chapman the next day to say that neither the mode of inspection and payment specified by Chapman nor the $7,500 (or $10,000) consideration were satisfactory to the client; that the latter was still seeking $35,000 and that the respondent had terminated his representation in the matter and was now "out of the case." That ended the negotiations. The art objects were never recovered.

There can be no other realistic characterization of the foregoing activities of respondent than participation in an attempt to extort a ransom for the return of valuable stolen property to its owner. This cannot be disguised as an innocent attempt by a lawyer merely to ascertain whether a reward was available for the return of fortuitously discovered stolen valuables and to report that fact to his prin-

cipal. This was obviously not the extent of respondent's activity. As clearly evident from his dealings with Weinberg and Chapman, he made himself an instrumentality of his principal in the attempt at extortion of money from the owner at threat of withholding his property from him—a threat which in fact was carried out by the principal. The fact that when agreement on terms could not be reached he "got out of the case" does not absolve him in the slightest. The nefarious conduct had already taken place. Respondent should either have stayed out of the affair entirely or advised the "client" to turn the goods over to the police or owner, awaiting such reward, if any, as might be paid in the ordinary course.

■■ Good moral character is a basic condition for membership in the bar. *In re Pennica,* 36 *N. J.* 401, 433–434 (1962); *In re Gavel,* 22 *N. J.* 248, 266 (1956). Any misbehavior, private or professional, which reveals lack of the character and integrity essential for the attorney's franchise constitutes a basis for discipline. *In re Mattera,* 34 *N. J.* 259, 264 (1961). Extortion is a "highly reprehensible" type of misbehavior for an attorney, requiring disbarment, *In re Communale,* 54 *N. J.* 47, 50 (1969). Participation in an attempt at any form of it is no less offensive insofar as moral character and integrity is concerned.

■ The above considerations alone would call for disbarment. But the transaction also has resulted in a conviction of respondent of the federal crime of conspiracy to sell and dispose in interstate commerce of goods known to have been stolen and of perjury. Conviction of perjury alone ordinarily warrants disbarment. *In re Foster,* 60 *N. J.* 134 (1972).

■ For the reasons already stated, the claim of amelioration of the offense because of advice allegedly given respondent by Mr. D. is not established. What he told Mr. D. he had in mind and what he did are at complete variance. The latter certainly never counselled what was done here

by respondent. Moreover the alleged poor advice of counsel at the trial is a frivolous basis for extenuation.

Respondent's name is ordered stricken from the roll.

*For disbarment*—Chief Justice WEINTRAUB, Justices JACOBS, HALL and MOUNTAIN, and Judges CONFORD, SULLIVAN and LEWIS—7.

*Opposed*—None.