IN THE MATTER OF JEROME I. GOER, AN
ATTORNEY AT LAW.

October 7, 1985.

## ORDER

The Disciplinary Review Board having filed a report with this Court recommending that JEROME I. GOER of MORRIS-TOWN, who was admitted to the bar of this State in 1971, be disbarred, and good cause appearing;

It is ORDERED that the Report and Recommendation of the Disciplinary Review Board is hereby adopted; and it is further

ORDERED that JEROME I. GOER be disbarred from the practice of law and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED JEROME I. GOER be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that JEROME I. GOER reimburse the Ethics Financial Committee for appropriate administrative costs.

## APPENDIX

*Decision and Recommendation of the
Disciplinary Review Board*

This matter is before the Board based upon a presentment filed by the District X (Morris County) Ethics Committee.

The presentment incorporates 11 complaints against Respondent which pertain to misappropriation of client trust funds and commingling of trust funds.

These charges are summarized as follows:

### 1. ALMITRON MATTER

Respondent was retained by Almitron Enterprizes, Inc. to defend it against a lawsuit which sought $2,733.43 in damages.

Respondent settled the case for $1,287.22. When Almitron later learned that a default judgment had been entered against it, Respondent claimed it was a mistake. He promised to correct the matter, but did not. Almitron through another attorney ultimately settled the case on the original terms. Almitron however, had previously forwarded to Respondent the settlement monies which he misappropriated.

## 2. MOESSNER MATTER

Respondent represented the Moessners in a property purchase. Respondent was to arrange for the cancellation of existing mortgages and judgments against the sellers. At the closing, the sellers received a net check and the Moessners assumed Respondent paid the existing mortgage of $14,019.11 and judgment of $1,707. However, Respondent never paid these obligations. He did not account for the money he received and the Moessners had to retain another attorney to resolve the matter.

## 3. SCHMELZ MATTER

Respondent was retained February 19, 1981 by Edward Schmelz, administrator of the estate of Hugh Schmelz, to represent the estate. In May 1982, Respondent asked Mr. Schmelz for partial payment of his fee and received $5,000. On September 2, 1982, Mr. Schmelz went to Respondent's office, signed the inheritance tax return and gave Respondent $2,529.38 to pay the tax liability, which he never paid. Mr. Schmelz's later attempts to contact Respondent were unsuccessful. When the decedent's property was sold in February 1983, Mr. Schmelz was required to place $2500 in escrow for the taxes. Mr. Schmelz was required to again pay the inheritance tax plus interest. A claim is presently pending before the Clients' Security Fund.

### 4. MLAKAR MATTER

Edward Mlakar retained Respondent in July 1983 to represent him in the purchase of a new home and the sale of his old home. Respondent delayed paying Mr. Mlakar $3,000 due him from his house sale for about two months. Mr. Mlakar had obtained a combination mortgage and construction loan, initially receiving $50,000 to buy the property. After construction commenced he received a check, payable to himself and Respondent, for $15,000. At Respondent's request, Mr. Mlakar gave him the check on November 2, 1983. Respondent promised to give him a trustee check within the week, but did not pay Mr. Mlakar until December 7, 1983. The check was for $14,750; Respondent had deducted $250 for legal fees. When the check was dishonored Respondent told Mr. Mlakar he had mistakenly placed the funds in the wrong account and that Mr. Mlakar should redeposit it. Again the check was rejected. Following the institution of civil suit and the issuance of a writ of attachment, Respondent gave Mr. Mlakar a check for $15,000, which cleared after the second deposit.

### 5. WERTHEIM MATTER

After Herman Wertheim had sold his business, he gave $55,000 in proceeds to Respondent, his attorney, to forward to his stock broker. Respondent's check to the broker was returned for insufficient funds. Respondent later sent a check for $40,000. The $15,000 difference was never forwarded. Nevertheless, Mr. Wertheim continued to have Respondent represent him in the sale of his home. Mr. Wertheim entrusted Respondent with the proceeds plus additional funds approximating $35,000 to purchase another tavern. Respondent gave the tavern seller, Route 183 Corporation, a trust check for $23,582.83. It was returned for insufficient funds. Respondent again claimed this had been a mistake, but the funds were never made good. The Clients' Security Fund has paid $14,000 to Mr. Wertheim and $23,582.83 to the Route 123 Corporation in this matter.

## 6. JAMES COLLINS MATTER

In September 1983 James Collins retained Respondent, whom he had known for ten years, to represent him in refinancing his home. Mr. Collins gave Respondent a check for $1,928.18 to cover the closing costs which Respondent cashed. In December 1983, Mr. Collins was informed that the property surveyor had not been paid, his old mortgage had not been cancelled and the new one had not been recorded. The Clients' Security Fund reimbursed Mr. Collins $564.00.

## 7. RALPH MORGAN MATTER

Respondent was retained in 1982 by Ralph Morgan who had a judgment entered against him for $4,350.53 by the telephone company. Respondent settled the claim for $3,826.50 and received a check from Mr. Morgan for that amount. In November 1982 Mr. Morgan was notified that the settlement remained unpaid. His requests for an explanation from Respondent went unanswered. Mr. Morgan received a letter dated March 19, 1984, from an attorney representing the telephone company which stated that Respondent had only made payments on his behalf of $1000. Respondent never accounted for the money received. Mr. Morgan received $2,826.51 from the Clients' Security Fund for his loss.

## 8. PAOLI MATTER

Frank Paoli retained Respondent in February 1980 to handle a negligence case on a contingency basis. The case was settled for $9,000. Mr. Paoli asked Respondent to hold the money until he and his wife resolved their marital differences. Later, Mr. Paoli retained another attorney to represent him in a matrimonial action. That attorney and Mr. Paoli were unsuccessful in ever obtaining the money from Respondent. Mr. Paoli was ultimately reimbursed $5,700 by the Client's Security Fund.

## 9. JAFFEE MATTER

Respondent was retained by his cousin, Joseph Jaffee, and his wife to represent them in a property sale. The sales contract dated November 14, 1982, provided for a $9,000 deposit by November 24, 1982. The deal apparently fell apart and no money was paid. Respondent sent a time of the essence notice on January 25, 1983, to the purchasers' attorney, but no agreement was formalized. Respondent informed the Jaffees that they would have to sue the buyers. He later told them the case was settled for $9,100. The Jaffees signed a release on December 14, 1983. They did not, however, receive the money. While that matter was pending, the Jaffees had a second contract to sell the same property. Respondent held the $4,000 deposit. The Jaffees authorized Respondent to act on their behalf at the June 3, 1983 closing. Respondent sent them a check for $14,505.96 with no accounting or closing statement. The Jaffees never received the $4,000 deposit.

## 10 & 11. SCHARLAT MATTERS

David Scharlat held a $30,000 mortgage on property he sold. When the mortgagors fell behind in payment, he retained Respondent in April, 1982 to commence foreclosure action. Respondent had Mr. Scharlat sign a discharge of the mortgage, dated December 29, 1983. Respondent gave Mr. Scharlat a hand written note of even date promising not to give any legal papers, including the mortgage discharge, to the purchasers until he received full payment. Respondent received a check dated December 28, 1983 for $40,175.27 from the purchasers' attorney to discharge all obligations. Mr. Scharlat never received any money.

Concerning another mortgage matter, Mr. Scharlat, who with other family members held a mortgage of $4,500, sought Respondent's services after the mortgagors fell behind in their payments. The Scharlats never received any money although Respondent had received the payments.

Mr. Scharlat testified that he lost his life savings as a result of Respondent's actions. The Scharlat family and David Scharlat individually received a total of $47,613.66 from the Clients' Security Fund on claims totalling $75,000. Mr. Scharlat could not be fully reimbursed since he had reached his individual claimant maximum.

The Office of Attorney Ethics contacted Respondent on January 3, 1984, after it learned that the Superior Court had granted an order of attachment against Respondent to recover $15,000 in the Mlakar matter (see paragraph # 4 *infra*). Subsequently, that Office and Respondent entered into a consent order for temporary suspension.

After Respondent was suspended, members of the District Ethics Committee went to Respondent's office to take possession of his files. They found his office in a state of disarray. Respondent admitted to those members that he had been personally using clients' funds. Respondent said he did not know how much money he had received or where it went but felt that it was around $60,000.

Although informed of the ethics charges and hearing, Respondent did not cooperate or participate. In particular, he did not make his files available to his clients.

After a hearing on May 17, 1984, the District Ethics Committee Panel found Respondent guilty of misconduct. They found that Respondent accepted clients' funds, failed to account for them and withdrew them for his own use, and failed to maintain trust account records as required, all in violation of *DR* 1–102(A)(3, 4 and 6); 6–101(A); 7–101(A), and 9–102(A, B and C).

Respondent advised by telephone that he would not attend the Board hearing.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Committee in finding Respondent

guilty of unethical conduct are fully supported by clear and convincing evidence.

During the ethics proceedings, it was stated that Respondent left a "trail of ruined lives". This financial and emotional hardship which Respondent inflicted on his clients can not be forgiven. *Matter of Dailey*, 87 *N.J.* 583, 594 (1981). To date, the Clients' Security Fund has paid our approximately $96,000 to numerous clients who were victimized by Respondent. Additional substantial claims remain pending. No restitution has been made.

The record clearly shows that this Respondent misappropriated funds belonging to his clients. Coupled with that uncontradicted evidence was Respondent's admission of misappropriation to Ethics Committee members when they took possession of his files. Respondent, admitted to the practice of law in 1971, offered no evidence in mitigation. The Board found none.

Respondent's professional misconduct also extends to his failure to cooperate in the ethics proceedings. An attorney is obligated to cooperate in ethics matters. *In re Gavel*, 22 *N.J.* 248, 263 (1956). More disturbing was his failure to make his files available to his clients after his temporary suspension.

The Board concludes that Respondent knowingly used his clients' funds for personal purposes. Disbarment is mandated. *In re Wilson*, 81 *N.J.* 451, 453 (1979). "It is clear from all of this that Respondent is unfit to be a lawyer." *Id.* at 454.

The Board further recommends that Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.