659 A.2d 1379

IN THE MATTER OF STEPHEN A. PEPE,
AN ATTORNEY AT LAW.

Argued May 1, 1995—Decided June 30, 1995.

*Nitza I. Blasini*, Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*George L. Schneider* argued the cause for respondent (*Lorber, Schneider, Nuzzi, Vichness & Bilinkas*, attorneys).

PER CURIAM.

An attorney-ethics complaint was filed against respondent, Stephen A. Pepe, a former Judge of the Superior Court. The complaint was based on a presentment filed by the Advisory Committee on Judicial Conduct of the Supreme Court of New Jersey (ACJC or Committee), which recommended that the Court initiate proceedings to remove respondent from judicial office, pursuant to *N.J.S.A.* 2A:1B–1 to –11 (repealed by *L.*1991, *c.* 119, § 4; replaced by *N.J.S.A.* 2B:2A–1 to –11). The Court removed respondent as a judge of the Superior Court and barred him from holding any future judicial office.

The ethics complaint charged respondent as an attorney with violation of Rules of Professional Conduct (*RPC*) 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects) and *RPC* 8.4(d) (engaging in conduct prejudicial to the administration of justice). A special master heard the matter and recommended the imposition of a public reprimand. Following its review of the matter, a majority of the Disciplinary Review Board (DRB) recommended a public reprimand. We, however, reject the recom-

mendation and order respondent suspended from the practice of law for three months.

I

The facts that give rise to the complaint are contained in the ACJC presentment:

Respondent and [a confidential informant for the Division of Criminal Justice] had known each other for about 16 years. In 1986, the Informant lived with Respondent for two weeks, during which time the two smoked marijuana on many occasions each day. The Respondent furnished this marijuana. The Informant moved away from the area in 1987 and had no contact with the Respondent for several years.

In May 1990, Respondent was fishing with his son on the Toms River when he was approached by the Informant, whom he had not seen since before his appointment to the bench. During their brief conversation, Respondent mentioned that he had become a Judge of the Superior Court and that his chambers were in the Ocean County Court House. After that conversation, Respondent and the Informant did not see one another again until the early morning of June 25, 1990, when the Informant visited Respondent at his chambers to ask for Respondent's help in getting a job. Respondent had the Informant wait outside his office and subsequently brought him back in and introduced him to a litigant in a matter that had been before Respondent for a calendar call and that was in the process of being settled. This litigant had known Respondent for many years and had built Respondent's house for him. The litigant and the Informant discussed the possibilities of employment, and they made arrangements to meet the following morning. Respondent and the Informant also agreed to meet the following day at the latter's apartment.

Respondent played a minimal role in the case involving the aforementioned litigant. When the case came before him at calendar call, the attorneys informed him that they were working out a settlement in the case. Respondent replied that any settlement would have to be put on the record before a different judge because he was recusing himself from any participation in the case on the basis of his knowledge of one of the parties, namely the litigant referred to above. The case was subsequently settled and the settlement was put on the record before a different judge.

Sometime between 5:00 and 5:30 p.m. on June 26, 1990, Respondent left the court house and went to the apartment rented by the Informant and his wife. There, the three of them smoked marijuana provided by the Respondent. They had used marijuana together in the past, prior to Respondent's appointment to the bench, as Respondent had admitted. At one point during the visit, when the Informant's wife was out of the room, the Informant suggested to Respondent that the two of them get together in the near future with some women known to the Informant and have a party at which all would smoke marijuana.

Subsequently, the Informant contacted law enforcement authorities and was put in touch with the New Jersey Division of Criminal Justice. He reported that Respondent had not only used marijuana but also used and distributed other drugs. He agreed to serve as a confidential informant and to have all conversations between Respondent and him recorded. He informed the Division that the United States Drug Enforcement Administration had seized over 200 pounds of marijuana that he was transporting earlier that year, and he further advised that he was cooperating in the DEA's investigation. The Division of Criminal Justice agreed, *inter alia*, to inform the DEA of the Informant's cooperation with it in the present matter.

On July 2, 1990, the Informant visited Respondent in his chambers. Unbeknownst to Respondent, the Informant was wearing recording equipment, and their conversation was being recorded by Detectives of the State Police. During this conversation, the Informant and Respondent discussed the possibility of future meetings at which they would smoke marijuana. Respondent stated that there would be no problem in his finding marijuana.

On July 3, July 9, and July 10, the Informant placed telephone calls to Respondent at his chambers. During the conversations on July 3, the Informant arranged for a meeting with Respondent and two women for anytime after 12:30 p.m. on the following Tuesday. The two women were undercover officers of the State Police. On July 10, Respondent told the Informant that he was very busy and would not be able to attend the meeting that Respondent had arranged for that day.

On July 12, 1990, the Informant went to Respondent's chambers, again wearing a concealed recording device. When he entered chambers, Respondent wrote out and handed him a note reading "Don't mention drugs" (Exhibit P-6). When the Informant said that the two women had been disappointed when Respondent did not show up for their meeting, Respondent wrote out another note reading "I didn't like the idea that we had to have pot 1st—made me nervous!" (Exhibit P-7). The Informant asked Respondent to visit his apartment the following week and to bring marijuana with him. After some discussion, Respondent replied that he had none. When the Informant asked about the marijuana that Respondent had brought to his apartment on June 26, Respondent replied that the marijuana in question was old and that he had no more.

After the conversation in Respondent's chambers, the Informant returned to the detectives who had been recording the conversation. The detectives reported what had occurred to the Division of Criminal Justice, and an application was made for a search warrant and for an order to compel Respondent to give a urine sample to the detectives. The application was granted, and the detectives went to Respondent's chambers shortly after noon. They informed him that he was under suspicion of possession and distribution of controlled dangerous substances and that both a search warrant and an order to produce a urine sample had been obtained. Respondent refused to permit a search until the warrant was physically delivered to him. When the warrant and the order arrived at Respondent's chambers, the detectives conducted a search and discovered the two notes mentioned above crumpled up in Respondent's wastebasket. The writing on both notes

had been crossed out but was still legible. Respondent also received the order to produce a urine sample, but he claimed to be unable to produce one even though he had attempted to use a rest room when the detectives first arrived in his chambers. As the afternoon wore on, Respondent claimed to be unable to produce the required sample, and an extension of the order was obtained. The issuing judge also directed that Respondent compress his bladder in an effort to produce a sample and that the detectives physically assist him if he were unable to produce one after a certain amount of time. One of the detectives subsequently pressed respondent's abdomen but without result. The detectives remained until after 7:00 p.m. and eventually left without a sample.

The ACJC found that respondent had used marijuana in the company of the informant and the informant's wife on June 26, 1990, and that he supplied the marijuana used on that date. The ACJC also found that respondent "improperly lent the prestige of his office to advance the private interests of the Informant" when he arranged an introduction with a litigant in a matter before him, for the purpose of obtaining a job for the informant. The Committee was unable to conclude that respondent possessed or distributed controlled dangerous substances other than marijuana, that respondent had falsified his time reports to reflect that he was working when he was not, or that other court personnel participated with him in the use of marijuana.

In the attorney-ethics proceedings, the special master characterized respondent's misconduct as both "deplorable and unbecoming a judge and an attorney at law." In considering the appropriate discipline, the special master noted that respondent had exhibited great remorse over his actions and that he had suffered great public humiliation. Under all of the circumstances, including respondent's past and continuing unblemished history, the special master recommended the imposition of a public reprimand. In his view, such discipline, "coupled by the well-known and publicly reported circumstances which [led] to his removal from the bench will ... protect the public interest and maintain confidence in the integrity of our bar."

The DRB noted that respondent engaged in misconduct on several occasions—once on June 26, 1990, while a Superior Court judge, and many times, years earlier, in 1986, over a two-week

period, when respondent's friend lived in respondent's home. In addition, respondent's misconduct was not limited to mere personal use of marijuana; he provided the illegal substance to third persons. Although the DRB acknowledged that respondent did not financially enrich himself, but rather, as had been noted by the special master, was "sharing" the substance with friends, that conduct "technically" constitutes "distribution" under the Criminal Code and, further, respondent involved third persons in an illegal activity while he was a member of the bench and bar.

The DRB also noted the finding of the ACJC that, while in his chambers, respondent met with the informant on one occasion and spoke with him by telephone on another in order to arrange for future meetings during which they planned to smoke marijuana. Therefore, not only did respondent engage in past illegal conduct and involve third persons in that conduct, but he also planned, from his chambers, to engage in future illegal activity.

Finally, and most significantly, according to the DRB, respondent committed the misconduct while he held the position of Judge of the Superior Court, and therefore was subject to a higher ethical standard.

In mitigation, however, the Board considered respondent's cooperation with the disciplinary authorities, his past and continuing unblemished career, and the indignation and extreme public and professional humiliation he suffered. In light of those mitigating circumstances, a four-member majority of the Board recommended a public reprimand as sufficient discipline for respondent's transgressions; one member would have imposed a three-month suspension, while two members would have imposed a private reprimand.

## II

Determinations made in judicial-removal proceedings are conclusive and binding in subsequent attorney-disciplinary proceedings. *In re Yaccarino*, 117 *N.J.* 175, 183, 564 *A.*2d 1184 (1989). Because the ACJC findings, which this Court substantial-

ly accepted in the removal proceedings, are binding in a subsequent ethics proceeding, the only issue to be determined is the appropriate quantum of discipline for respondent's misconduct. *Ibid.; see In re Hasbrouck,* 140 *N.J.* 162, 164, 657 *A.*2d 878 (1995) (noting that when ethics violations are admitted, focus of the disciplinary proceeding is on extent of discipline). Determining the appropriate measure of discipline, however, is extremely fact-sensitive. *In re Kinnear,* 105 *N.J.* 391, 395, 522 *A.*2d 414 (1987); *In re Litwin,* 104 *N.J.* 362, 366, 517 *A.*2d 378 (1986).

The privilege to practice law is founded on high moral character. *In re La Duca,* 62 *N.J.* 133, 140, 299 *A.*2d 405 (1973); *In re Pennica,* 36 *N.J.* 401, 433–34, 177 *A.*2d 721 (1962); *In re Gavel,* 22 *N.J.* 248, 266, 125 *A.*2d 696 (1956). Further, attorneys who occupy positions of public trust are held to higher ethical standards. *See, e.g., In re Hoerst,* 135 *N.J.* 98, 638 *A.*2d 801 (1994); *In re Bock,* 128 *N.J.* 270, 607 *A.*2d 1307 (1992); *In re Kotok,* 108 *N.J.* 314, 528 *A.*2d 1307 (1987).

Criminal conduct by an attorney is a particularly egregious form of unethical behavior. In addition to evidencing professional unfitness and lack of good character, the commission of a crime demonstrates a fundamental disrespect for the law and, when criminal conduct is confirmed by an admission or conviction, it is conclusive evidence of an attorney's guilt in disciplinary proceedings, *R.* 1:20–6(b)(1); *In re Hasbrouck, supra,* 140 *N.J.* at 166; *In re Kinnear, supra,* 105 *N.J.* at 395, 522 *A.*2d 414. That principle applies with equal force with respect to the effect of a determination or admission of judicial misconduct for which judicial discipline has been imposed. *E.g., In re Yaccarino, supra,* 117 *N.J.* at 183, 564 *A.*2d 1184.

Misconduct by an attorney, whether private or professional in nature, that evidences a want of the good character and integrity that are essential for a person to engage in the practice of law constitutes a basis for discipline. *In re Franklin,* 71 *N.J.* 425, 429, 365 *A.*2d 1361 (1976); *In re La Duca, supra,* 62 *N.J.* at

140, 299 *A*.2d 405; *In re Gavel, supra,* 22 *N.J.* at 266, 125 *A*.2d 696. The obligation of an attorney to maintain the high standard of conduct required by a member of the bar applies even to activities that may not directly involve the practice of law or affect the attorney's clients. *In re Rutledge,* 101 *N.J.* 493, 498, 502 *A*.2d 569 (1986); *In re Huber,* 101 *N.J.* 1, 4, 499 *A*.2d 220 (1985); *In re Suchanoff,* 93 *N.J.* 226, 230, 460 *A*.2d 642 (1983); *In re Franklin, supra,* 71 *N.J.* at 429, 365 *A*.2d 1361. The Court's central concern in the administration of attorney discipline is not to punish the attorney, but, more broadly, to promote public confidence in the integrity of the bar. *In re Kinnear, supra,* 105 *N.J.* at 397, 522 *A*.2d 414; *In re Kaufman,* 104 *N.J.* 509, 513, 518 *A*.2d 185 (1986); *In re Kushner,* 101 *N.J.* 397, 400, 502 *A*.2d 32 (1986). Transgressions by attorneys that bespeak indifference to the law and the legal system destroy public confidence in the integrity of the bar. Hence, they warrant correction and discipline, even though they may not directly implicate the practice of law or hurt a client's interests.

The DRB observed that while the Court and the Board have had several occasions to address drug-related offenses in the attorney disciplinary context, only one of those cases, *In re Echevarria,* 119 *N.J.* 272, 574 *A*.2d 991 (1990), involved the use and possession of a small amount of marijuana, as opposed to a differently scheduled drug, such as cocaine. The DRB further commented that in that case, the Court imposed a public reprimand and although the DRB had also recommended the imposition of a public reprimand, it would have recommended the imposition of a private reprimand if the matter were not aggravated by the fact that the attorney had, years earlier, received a conditional discharge for similar conduct.

We do not equate respondent's derelictions in this case with that presented in *Echevarria.* Although the drug was marijuana, respondent's involvement with the drug was not innocuous. Respondent was guilty of "sharing" or distributing marijuana; he used the marijuana on more than one occasion; he conspired to

continue the use of marijuana and to involve other persons in that use; and he had engaged in the possession and use of marijuana in the past.

We find, therefore, that, in terms of gravity, respondent's conduct is comparable to those cases in which this Court has consistently ordered a three-month suspension. *See, e.g., In re Benjamin,* 135 *N.J.* 461, 640 *A.*2d 845 (1994) (three-month suspension for unlawful possession of 0.26 grams of cocaine and under 50 grams of marijuana); *In re Sheppard,* 126 *N.J.* 210, 594 *A.*2d 1333 (1991) (three-month suspension for possession of under 50 grams of marijuana and for failure to deliver a controlled dangerous substance (cocaine) to a law enforcement officer); *In re Nixon,* 122 *N.J.* 290, 585 *A.*2d 322 (1991) (three-month suspension for possession of less than 50 grams of marijuana and 126 grams of cocaine).

Of greater import is the fact that respondent, in effect, committed these drug offenses under the cover of his judicial position. Respondent's illicit activity occurred within the court house, thus not only symbolically, but actually and visually, traducing the cause and image of justice. That conduct expresses not simply a disrespect for the law but an effrontery bordering on contempt for the administration of justice. Even though respondent's conduct did not directly involve the discharge of judicial duties, it did directly compromise the judiciary as an institution. The actions of respondent reflect an attitude that is diametrically antagonistic to the values inherent in the Canons of Judicial Conduct, and is intolerable in a judge. That attitude is equally unacceptable in a lawyer. *E.g., In re Kinnear, supra.*

We continue to believe that an attorney who breaks the criminal laws relating to the possession of controlled dangerous substances thereby commits ethical infractions that demonstrate a disrespect for law, denigrate the entire profession and destroy public confidence in the practicing bar. *In re Schaffer,* 140 *N.J.* 148, 657 *A.*2d 871 (1995). Effective and meaningful discipline is clearly warranted.

 We consider in mitigation respondent's good record. We are not unmindful of his undoubted painful embarrassment and deep remorse. However, those genuine personal consequences do not obviate appropriate discipline. Contrition and mortification alone cannot repair and restore public confidence in the profession. Only adequate. discipline can accomplish that because it enables the public to realize that the judiciary will not tolerate or excuse such conduct by attorneys and will vigilantly act to rectify and prevent such conduct. That reasoning applies with similar force to the fact that respondent has been disciplined as a judge by his removal from judicial office. Judicial discipline deals directly with the need to preserve the integrity of the judiciary. It does not, however, deal directly with a respondent's professional responsibility as an attorney and it cannot alone renew the public's confidence in the practicing bar.

> This Court has long recognized that there is a duality of professional responsibility on the part of lawyers who serve in the judiciary. Their professional loyalty runs both to the judicial office in which they serve and the profession of which they are members. Indeed, the status of an attorney as a member of the legal profession is a condition for the holding of judicial office. *N.J. Const.* art. VI, § 6, par. 2 (1947). Thus, if misconduct affects both the judicial office and the professional status of a lawyer, the public interest in both judicial and professional integrity can be implicated by the lawyer's conduct in judicial office.

> [*In re Yaccarino, supra,* 117 *N.J.* at 179, 564 *A.2d* 1184.]

> \* \* \* \* \* \* \* \*

> [W]e recognize that an attorney who has engaged in ethical misconduct while serving as a judge may be exposed to professional discipline in his or her capacity as a lawyer. Judicial discipline for such misconduct neither obviates nor forecloses professional discipline.

> [*Id.* at 182, 564 *A.2d* 1184.]

We thus reaffirm the reasons that have prompted us to discipline attorneys who have also been subject to judicial discipline, *e.g., In re Bock, supra; In re Yaccarino, supra.*

Respondent is suspended from the practice of law for three months. In addition, respondent is to reimburse the Disciplinary

Oversight Committee for costs, including but not limited to the cost of producing transcripts.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

### ORDER

It is ORDERED that **STEPHEN A. PEPE** of **TUCKERTON**, who was admitted to the bar of this State in 1971, is hereby suspended from the practice of law for a period of three months, effective July 24, 1995, and until the further Order of the Court; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with *Rule* 1:20–20, which governs suspended attorneys; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.