IN THE MATTER OF LEO J. BARRETT, AN ATTORNEY
AT LAW.

Argued December 15, 1981—Decided April 14, 1982.

*David E. Johnson, Jr.* argued the cause for complainant Disciplinary Review Board (*Colette A. Coolbaugh*, secretary, attorney).

*Robert A. Coogan* argued the cause for respondent (*Coogan, Pandolfe & Shaw*, attorneys).

PER CURIAM.

After considering five complaints against respondent, the District IX Ethics Committee for Monmouth County issued presentments on three of the matters and recommended private reprimands on two. The Disciplinary Review Board agreed that Barrett had engaged in unethical conduct. After a hearing, the Board recommended that respondent be disbarred and reimburse the Administrative Office of the Courts for appropriate adminis-

trative costs, including preparation of transcripts and cost of mailing.

Our independent review of the entire record leads us to the conclusion that respondent has indeed been guilty of unethical conduct in the matters charged. However, while we attach considerable weight to the recommendation of the Disciplinary Review Board, it is our view that a suspension with conditions hereinafter stated appropriately reflects the seriousness of respondent's misconduct and will adequately protect the public.

## I. *Muller Matter*

Respondent represented John J. Muller in 1975. In July of that year respondent borrowed $13,000 from the complainant which was to be secured by a second mortgage on respondent's property. The only evidence of a mortgage being delivered in 1975 was respondent's testimony that he delivered to complainant a mortgage executed by himself together with the mortgage note dated July 21, 1975. Complainant denied receiving either a signed mortgage or the mortgage note. No mortgage was recorded. In fact, respondent did not acquire title to the subject property until August 7, 1975, several weeks after he allegedly executed and delivered to his client a mortgage on that property.

Only after the complaint to the Ethics Committee was filed, did respondent cooperate with the complainant. Thereafter, the parties worked out an extension of the loan and a mortgage was executed by respondent and recorded as security for the prior balance plus interest to date.

The Committee concluded that respondent's conduct reflected adversely on the profession and violated *DR* 1–102(A)(6) and *DR* 5–104(A).

We agree. Even though there is a dispute in testimony as to whether respondent gave his client a mortgage to record himself, in either event, the conduct is unprofessional. All transactions of an attorney with his client are subject to close

scrutiny. As Justice Jacobs said, "[a]n attorney who enters into business ventures with his client does not, in the eyes of his client or the public, shed in chameleon fashion his professional standing and obligation and there is no just reason why he should be permitted to do so." *In re Carlsen*, 17 *N.J.* 338, 346 (1955). *Accord In re Gallop*, 85 *N.J.* 317 (1981). As a general rule, an attorney should refrain from engaging in transactions with a client or former client who has not obtained independent legal advice on the matter. *In re Hurd*, 69 *N.J.* 316 (1976). Here, although respondent had a personal interest in the transaction, he did not even suggest that Muller seek outside legal counsel. Respondent's argument that his client had many years experience in such matters does not exonerate him. See *In re Honig*, 10 *N.J.* 74, 79 (1952). A lawyer exercising ordinary care for a lender-client under these circumstances almost certainly would have insisted upon security for such a loan. Respondent does not deny it was offered. It was his duty to see that it was promptly delivered and recorded. That was not done.

## II. *Asay Matter*

In March of 1974, the respondent represented Frederick K. Draper in connection with a dispute with Claude F. Asay, Jr. Asay was the principal in a corporation named Fidelity Alarm and Data Corporation (Fidelity), which was engaged in the business of providing investigative services and rendering private security services. Draper and Fidelity had entered into an agreement dated November 7, 1973, and Draper paid Fidelity $10,000 for the rights to what was a distributorship or franchise. Draper subsequently sought to dissolve that agreement.

By letter of March 15, 1974, the respondent wrote to Carl P. Gross, Esq., attorney for Asay and his company, Fidelity, stating that unless Asay returned the $10,000 he was instructed by Draper to institute suit for fraud.

By letter of May 3, 1974, respondent repeated his demand for the return of the money and again threatened suit for fraud,

misrepresentation and breach of contract. In addition, respondent wrote: "We are also pursuing the possibility of criminal action against Messrs. Olivera and Asay." Olivera was an employee of Fidelity.

On June 18, 1974, Frederick Draper filed, in the Municipal Court of the Borough of Freehold, complaints against Asay and Olivera, charging them with having obtained the money by false promises, statements and representations in violation of *N.J.S.A.* 2A:111–1.

The civil dispute was settled, with Asay returning the money to Draper and Ewing. Thereafter, respondent asked the Freehold Borough Municipal Court to drop the criminal charges.

The Committee concluded that the filing of the criminal complaint was obviously done for the purpose of effecting a settlement of the civil suit and that the letter of May 3, 1974 constituted a threat to present criminal charges to obtain an improper advantage in a civil matter in violation of *DR* 7–105(A).

We agree. "A lawyer may not resort to coercive tactics of threatening criminal action in order to effect a civil settlement. *Drinker, Legal Ethics* (1953), p. 153." *In re Dworkin*, 16 *N.J.* 455, 456 (1954). *Cf. In re Friedland*, 59 *N.J.* 209 (1971) (outlining the lawyer's duties when criminal charges are to be dismissed). Respondent contends that his letter was nothing more than a statement of fact on his part about discussions with his client and that the evidence only sustains an "impression" on the part of Asay's attorney that criminal charges were threatened. *DR* 7–105(A) states that "[a] lawyer shall not present, participate in presenting, or threaten to present criminal charges in a civil matter." Our independent evaluation of the record is in accord with the Committee's conclusion that, whatever respondent's personal state of mind, he engaged in activity proscribed by *DR* 7–105(A).

### III. A. *Cassidy Matter*

Respondent, in November 1976, represented John E. Cassidy in connection with a matrimonial action and on November 24, 1976, prepared an affidavit for Mr. Cassidy's signature, signed his client's name to the affidavit, and filed it with the Court.

At the ethics hearing, respondent admitted that he signed his client's name pursuant to a handwritten authorization, secured the signature of the notary to the jurat by his secretary and filed the affidavit with the Court. The Committee was of the opinion that the respondent's conduct reflected adversely on the profession and violated *DR* 7–102(A)(4), (5) and (7).

### B. *Augelli Matter*

This complaint originates from a matrimonial proceeding in the Superior Court of New Jersey, Chancery Division, Monmouth County, in which the complainant was represented by the respondent and the complainant's former husband was represented by another. The matrimonial action ended with a settlement entered into in open court and a judgment for divorce on behalf of the complainant's former husband. The dissatisfied litigant filed ethics charges against respondent.

The primary issues raised by the complaint were dismissed upon recommendation of the District IX Ethics Committee. The panel, however, noted that the respondent testified at the District IX ethics hearing that he mailed an affidavit to the complainant for her signature. The Committee concluded that respondent took her jurat out of her presence after she had mailed it back to him and that this action violated *DR* 1–102(A)(1), (4), (5) and (6).

In the *Augelli* and *Cassidy* matters, the facts are undisputed. The respondent himself brought up the *Augelli* matter by testifying to the occurrence. Respondent's view is that this is more a matter of form than of substance since he could have used a certification rather than a jurat to achieve the same effect. He further asserted the hardship it would have been for his client to come to the office.

*In re Surgent,* 79 *N.J.* 529 (1979) states our intention to "disabuse the bar of any lingering notion that the plain and unmistakable requirements regarding the execution of jurats and taking of acknowledgements need not be met in all respects." *Id.* at 532. *Compare In re Breidt and Lubetkin,* 84 *N.J.Eq.* 222 (Ch.1915) with *In re Conti,* 75 *N.J.* 114 (1977); and see *In re Mocco,* 75 *N.J.* 313, 317 (1978). Had respondent taken the effort, he could have had his client sign a certification in lieu of oath. *R.* 1:4–4(b).

In affixing his client's signature to an affidavit under these circumstances, respondent manifested a disrespect for the legal process that is inconsistent with acceptable professional conduct. *In re Conti, supra,* 75 *N.J.* at 117 (1977). Protestations that he did not know or think the conduct was proscribed cannot serve as an excuse. The very language of the jurat put respondent on notice that his client had to appear in person before the oath taker. *In re Mocco,* 75 *N.J.* 313, 317 (1978).

### IV. *Claps Matter*

This matter arose out of a matrimonial proceeding, *Grazioso v. Grazioso.* In that proceeding, Claps represented Mr. Grazioso and respondent represented Mrs. Grazioso. The proceeding was contested throughout, and a trial was held in November 1977. At the conclusion of the trial, both attorneys sought counsel fees and affidavits were submitted to the Court. Judge Ashbey, the trial judge, would not accept respondent's affidavit due to improper form and gave respondent an opportunity to submit a second affidavit in proper form.

Judge Ashbey rendered her decision on or about November 7, 1977 but reserved judgment on the issue of counsel fees due to the problem with respondent's affidavit.

In late December 1977, respondent did submit his revised affidavit, which was received by Judge Ashbey's office on December 22, 1977.

On December 22, 1977, prior to receipt of said affidavit, Mr. Claps wrote to respondent and again requested the Judgment of

Divorce. The letters crossed in the mail, and on December 23, 1977, Mr. Claps did receive a proposed form of judgment. He made certain revisions to the form, affixed his consent, and returned the document to respondent on December 27, 1977. The document, at that time, did *not* have any provision for counsel fees.

Mr. Claps heard nothing further from either Judge Ashbey or respondent. Finally, on February 8, 1978, he wrote to respondent inquiring as to the status of the matter. On February 15, 1978, he received a copy of the signed judgment from respondent. Its form had been revised and a clause had been added awarding $750 to respondent for counsel fees. Mr. Claps was never notified of this addition, objected to it, and strongly objected to the revision of a document to which he had previously consented.

Respondent admitted that he added the clause and Judge Ashbey's secretary testified that Judge Ashbey had written in the sum of $750. In his pleadings, and in his initial testimony, respondent asserted that he forwarded the form of judgment to Judge Ashbey, was told to add the clause pertaining to counsel fees, received the form back in the mail, revised it, and then returned it to Judge Ashbey. However, no correspondence was presented to support this chain of events and the judge's secretary testified that it could not have occurred. If a clause was to be added to a document submitted to Judge Ashbey, she would add it and would not return it to the attorney for revision. Thereafter, respondent revised his testimony. He acknowledged that he may have added the clause initially and then forwarded the form to Judge Ashbey. In either event, he said he sent the form of judgment on January 26, 1978 and stated in his covering letter that he was including "a paragraph" relating to the award of counsel fees. This letter of January 26 does show a carbon copy to Mr. Claps, but Mr. Claps denied that he ever received same.

The Committee believed that Mr. Claps did not receive a copy of the January 26 letter. His letter of February 8 would have been unnecessary if he had. On the other hand, the Committee could not determine whether a carbon copy of the January 26 letter was actually mailed by respondent's office to Mr. Claps. Respondent was given the benefit of the doubt in this regard by the Committee.

The Committee found that the events, as detailed above, constituted improper conduct by respondent. He admitted altering a document that had been previously consented to by another attorney, that he never contacted that attorney regarding the revision, that he certainly never asked the attorney for his consent to this revision, and that he may not have even notified him of it prior to presentation of the document to the Court. Moreover, the document as presented to Judge Ashbey indicated that Mr. Claps did consent to some counsel fee for respondent, a misrepresentation at best. The Committee concluded that respondent did not act in the best interests of the legal profession and his conduct reflects adversely on the practice of law and violated *DR* 1–102(A)(1), (4), (5) and (6).

We agree. *DR* 1–102(A)(4) makes clear that misrepresentation is unprofessional conduct. Under these circumstances, whether due to clerical mishap or not, a fact was misrepresented to the court that was unwarranted.

■ Upon an independent review of the record, the Court is satisfied that the conclusions of the Committee in finding unethical conduct in the five matters are fully supported by clear and convincing proof. We do not agree with the Board, however, that respondent's behavior warrants his disbarment.

Aside from the *Muller* matter, respondent's breaches of professional standards were not undertaken for the purpose of self-enrichment. Comparable instances of professional misconduct have resulted in sanctions less severe than disbarment: *In re Gallop, supra,* 85 *N.J.* 317; *In re Mocco, supra,* 75 *N.J.* 313; *In re Conti, supra,* 75 *N.J.* 114; *In re Surgent, supra,* 79 *N.J.* 529; *In re Dworkin, supra,* 16 *N.J.* 455.

Taken together, respondent's conduct reflects an insensitivity to the degree of professionalism expected of every member of the bar. His written presentation to the Court, attributing his problems to the *animus* of the District Committee, demonstrates a lack of recognition of the high standards of responsibility required of every member of the profession. In mitigation, it should be noted that respondent has been under stress due to the breakup of his marriage and has left his practice to reside in Connecticut. He is currently under medical treatment.

Under all the circumstances, we conclude that the appropriate discipline is to suspend respondent for three years and until he submits medical proof that he is capable of practicing law. We further direct that respondent reimburse the Administrative Office for costs.

*For suspension* —Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*Opposed* —None.

## ORDER

It is ORDERED that LEO J. BARRETT of Red Bank be suspended from the practice of law for a period of three years and until he can submit medical proof that he is capable of practicing law, effective immediately and until the further Order of the Court; and it is further

ORDERED that respondent reimburse the Administrative Office of the Courts for the costs incurred in this matter, including transcripts; and it is further

ORDERED that, pending such reimbursement and restoration, respondent is restrained and enjoined from practicing law during the period of his suspension and further directed to comply with all the regulations of the Disciplinary Review Board governing suspended, disbarred and resigned attorneys.