IN THE MATTER OF ARTHUR D. REISS, AN
ATTORNEY AT LAW.

Argued November 19, 1985—Decided January 8, 1986.

*Colette A. Coolbaugh,* Executive Counsel, argued the cause for the Disciplinary Review Board.

*Arthur D. Reiss* argued the cause *pro se.*

PER CURIAM.

This disciplinary proceeding arises out of three presentments filed by the District 11–A Ethics Committee (the Ethics Committee), which concluded in each matter that respondent had committed unethical conduct. The Disciplinary Review Board (DRB) agreed with the Ethics Committee's finding of unethical conduct, and recommended that respondent be suspended from the practice of law for one year. Our independent review of the record leads us to accept that recommendation.

I

Respondent, a sole practitioner, was admitted to practice law in New Jersey in 1974. He is also admitted in New York and Connecticut. The presentments stem from three separate transactions.

*DiMaria/Four Square Builders, Inc.*

In early 1978, Robert DiMaria, Victor Canzanai, and John Weierstall, three carpenters, came to respondent for legal services in connection with the formation of a corporation to purchase and develop property in Montvale, New Jersey. Respondent expressed an interest in participating in the venture. The parties agreed and the respondent incorporated Four Square. Each party received a one-quarter interest in the corporation and contributed $5,000 to the corporate capital. Respondent's 25% share of the corporation was taken in the name of his wife because of certain problems involving a prior marriage.

The parties agreed that respondent would perform the legal work for the corporation, for which he would receive no compensation, and each of the other principals would contribute their own services, for which they would receive no compensation. Each man became an officer of the corporation, and corporate resolutions provided that any one of the four could

sign checks. The checkbook was maintained in respondent's office, and he was responsible for paying all the bills.

At no time did respondent advise any of the other three principals as to any actual or potential conflict of interest between himself and the other participants in the corporation. Nor did he discuss the advisability of a stockholders' agreement. No corporate books were completed and no meetings of stockholders or directors were ever conducted.

Four Square proceeded to subdivide and develop the Montvale property. Two houses were built and sold for a substantial profit.

After the Montvale project was completed, the other principals in Four Square decided to develop property in Saddle River with a mason contractor. While they did not ask respondent to be an officer of the new company, they did ask him to do the legal work for it, which he did. Carmas Construction Company was incorporated on July 19, 1978.

In the spring of 1979, respondent learned of a tract of land for sale in Washington Township. He suggested to DiMaria and Canzanai that this should be a Four Square project. (At this time, Weierstall was no longer active in the corporation.) The contract of sale between Four Square and the seller was contingent upon the purchaser's ability to subdivide the property into three lots. Respondent forwarded a $10,000 check from Four Square to the real estate broker. Although the check was apparently "good" when issued, the check was never turned over to the sellers or the sellers' attorney, but was retained in the real estate broker's file.

Four Square applied to the Washington Township Planning Board (Washington Township) for a subdivision of the property. Respondent appeared as attorney for Four Square Builders, accompanied to the various hearings by DiMaria, president of the corporation.

During the pendency of the subdivision application, respondent met with DiMaria and Canzanai to request that the equi-

ties of the parties be adjusted so he would receive 40% of the profits and each of them would receive 30%. DiMaria and Canzanai refused.

Washington Township denied the three lot subdivision. The testimony as to when DiMaria and Canzanai knew what transpired thereafter is in conflict. Respondent states that after he and the other principals of Four Square were unable to agree on a revised split of profits, he advised them that since the Washington Township project "came to me and it's my deal, ... I'm going to go ahead with it like you went ahead with Saddle River without me." DiMaria testified that he had no idea that respondent was going to "take the deal for himself."

In any event, after the planning board denied the proposal for a three-lot subdivision, respondent on behalf of Four Square filed a new application for a two-lot subdivision. Respondent said he entered into the contract to buy the property and proceeded with planning board approval in the name of Four Square because of the time limitation imposed by the seller. He then formed Timberland Corporation on August 9, 1979, with his wife listed as the sole stockholder. He later filed an amended application listing Timberland as the successor in interest. On January 2, 1980, the planning board granted the subdivision application. At some later point, respondent told DiMaria and Canzanai they could buy back into the project if they agreed to the 40/30/30 split and paid in additional money proportionally to repay him for the land.

During the late summer of 1979, problems developed between respondent and his land development partners concerning the construction of his home. He felt they were not devoting sufficient time to this project so his house could be completed on schedule. As a result of their deteriorating relationship, the partners retained another attorney to represent them.

In October 1980, respondent received $2,737.28 from the Borough of Montvale as a result of a civil suit he had filed on behalf of Four Square to release the cash deposit posted in

connection with subdivision improvements. He deposited this money in his trust account and disbursed $1,500 to himself. The balance was paid to other corporate creditors. Respondent had loaned Four Square $1,500 to pay a subcontractor. He claimed he told DiMaria at that time that he would take his money back as soon as Four Square had sufficient funds. There is a sharp conflict of testimony as to whether or not respondent was authorized to disburse $1,500 from his escrow account to repay his loan to the corporation. Nevertheless, there appears to be no question that the corporation's funds, received from the Borough of Montvale, were not turned over to the corporation but were disbursed through respondent's trust account during the negotiations between respondent and the other principals of the corporation in settling their disputes.

In the DiMaria/Four Square Builders matter, the DRB found that: Respondent created a conflict of interest when he involved himself as a business partner and as corporate attorney; he took away for his own benefit a corporate opportunity that belonged to his client Four Square; and he preferred himself as a creditor. Further, the DRB found that respondent's actions violated *DR* 5–104 [1] when he entered into a business venture with his client.

### Berman/Supro

Upon the death of her husband, Patricia Berman became the owner of two companies, Supro-Realty Corporation and Supro-Paint Corporation. The realty company owned the land and building in which the paint company maintained its office and business. A major creditor of the paint corporation was Pur-All Paint Products Co., Inc. Respondent's father-in-law,

---

[1] We refer to the Disciplinary Rules that governed the conduct of attorneys at the time of these occurrences. American Bar Association, *Code of Professional Responsibility* (1969). Effective September 10, 1984, the *Rules of Professional Conduct* of the American Bar Association, as modified by the Court, govern that conduct. *R.* 1:14. Those rules contain provisions equivalent to the Disciplinary Rules involved here.

Rubin Chaleff, was the principal of Pur-All, and it is undisputed that respondent was the attorney for Pur-All.

In August, 1982, respondent attended a meeting concerning Supro-Paint Corporation. He had been recommended to Berman by Chaleff, who had been a close friend and adviser of her late husband. Mrs. Berman knew that respondent was Chaleff's son-in-law. At this time, Supro-Paint owed Pur-All about $70,000 and also owed a substantial amount to a bank.

At this meeting, respondent assured Berman that he was her attorney. He did not advise her of any actual or possible conflict of interest between his serving as her attorney and his being related to a primary creditor of Supro-Paint. She did not suspect any conflict because of his assurance that he would represent her interests.

Respondent understood that the purpose of the August meeting was to arrange for an employee takeover of the paint company, to sell the property owned by Supro-Realty, and to protect Pur-All's interest. Accordingly, he testified that he did not think there was any adverse relationship between any of those parties, that everything was discussed, and that everyone knew what they were trying to do. Berman testified that at the meeting Chaleff was pressuring her to promise him that proceeds from the sale of the building would be used to pay his company. She made no promises to him.

Respondent represented Berman, Supro-Paint, and Supro-Realty. For Supro-Paint, he was involved in various corporate problems and performed various legal services. He also negotiated for the sale of lands and premises owned by Supro-Realty. In 1983, during negotiations for a sale of the building, respondent frequently reminded Berman of her moral obligation to his father-in-law. Berman, feeling threatened by his pressure, ultimately hired another attorney to represent her. By this time, respondent had negotiated the terms of the contract and completed all the paperwork except the closing.

The contract for the sale of the land contained a provision that respondent was to hold in escrow the deposit sum of $50,000 pending the closing of title. There was no provision in the contract as to whether the $50,000 should be deposited in an interest-bearing account or who should receive the interest. Without the authorization of his client or the purchaser, respondent deposited the $50,000 in an interest-bearing account under his own social security number.

Prior to the closing, respondent refused to release this deposit until his fee was paid. Initially, he claimed a fee of $7,500, but later reduced it to $6,500, $5,000 to be paid by Berman and the balance from the accrued interest. Not until the closing, and even then only after a telephone conversation with one of the brokers who himself had to drive over to collect the money, did respondent finally release $45,000 from the account. He retained the balance, including interest, as his fee.

Following his dismissal by Berman as attorney for herself and the Supro Corporations, respondent commenced an action on behalf of Pur-All against Supro-Paint and subsequently against Patricia Berman personally for the collection of the Supro obligations to Pur-All.

During the Ethics Committee's hearings, evidence was introduced that in another matter in which Supro-Paint was the plaintiff, respondent had filed with the Superior Court a Certification, in which he swore "I was never retained to represent the Plaintiff, and, in fact, did not." This sworn statement was in direct contradiction with respondent's previous written statements wherein he asserted that he was "counsel to Supro-Paint Corporation for six months concerning various problems which arose during the course of their business," as well as respondent's testimony at the hearings.

The DRB found that respondent was involved in a conflict of interest while representing both Berman and his father-in-law, and that the suit he later filed against Berman aggravated this conflict. Based upon these violations, the DRB found that

respondent vioalted *DR* 5–101(A). Moreover, the DRB determined that by his failure to turn over the $50,000, he violated *DR* 9–102(A)(2) and *DR* 9–102(B)(4). And the DRB determined that by filing the false certification, respondent violated *DR* 7–102(A)(5), (6) and (7) and *DR* 1–102(A)(4).

Further, in connection with Berman's complaint, the Division of Ethics and Professional Services (DEPS) conducted an audit of respondent's books in November 1983. The auditor concluded that respondent did not maintain his client trust ledger in accordance with Rule 1:21–6, frequently used his trust accounts in connection with his personal businesses, and commingled clients' transactions with personal transactions. The DRB found that respondent's recordkeeping (or lack thereof), his improper use of his trust account, and his commingling of trust and business expenses all violated *DR* 9–102(C) and Rule 1:21–6.

*Sammarco*

The Sammarco matter represents the least serious of respondent's alleged acts of misconduct. Respondent had represented Gloria Sammarco, the ex-wife of Stephen Sammarco, in a matrimonial action. By court order, Mr. Sammarco was assessed a total of $850 toward his wife's counsel fees. Mr. Sammarco's attorney, by letter dated July 30, 1982, informed respondent that Sammarco intended to pay $25 a month for the "next year" and $100 a month thereafter. Mr. Sammarco forwarded a check for $25 to respondent under separate cover. Respondent rejected this by a letter sent directly to Mr. Sammarco demanding full payment and threatening a wage execution. Sammarco's attorney was not sent a carbon copy, which respondent claimed was an oversight.

Mr. Sammarco received this letter on Saturday, July 31, 1982. Unable to reach his own attorney, he telephoned respondent. Respondent initially told Mr. Sammarco that he did not want to speak to him, but they kept talking for approximately an hour. Respondent knew that Mr. Sammarco was represented by an

attorney. Nevertheless, he never indicated to Mr. Sammarco that they should not be speaking directly with each other or that Mr. Sammarco should discuss the matter with his own attorney.

The discussion became heated, leading Mr. Sammarco to hang up. Then Mrs. Sammarco called respondent and he continued the discussion with her. During the course of that conversation, respondent offered to accept $150 per month in payment of the court-ordered counsel fees. Respondent did not advise Mr. Sammarco's attorney of this settlement proposal until after he was advised that an ethics complaint was being filed. Respondent obtained a court order directing Mr. Sammarco to pay the $150 monthly payments beginning November 10, 1982. The DRB concluded that respondent violated *DR* 7–104(A)(1).

## II

Based upon our independent review of the full record, we are satisfied by clear and convincing evidence that respondent is guilty of unethical conduct and that a one-year suspension is the appropriate punishment. The record demonstrates that he does not comprehend his professional obligations or understand the concept of conflict of interest. His conduct in these three cases discloses an entirely unacceptable insensitivity to these basic ethical considerations.

We review first the DiMaria/Four Square matter. *DR* 5–104(A) provides:

(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

We have warned attorneys repeatedly of the dangers of engaging in business transactions with clients. *In re Barrett,* 88 *N.J.* 450, 453 (1982); *In re Hurd,* 69 *N.J.* 316, 330 (1976); *In re Gavel,* 22 *N.J.* 248, 262 (1956); *In re Carlsen,* 17 *N.J.* 338, 346 (1955). "An attorney who enters into business ventures with his client does not, in the eyes of his client or the public

generally, shed in chameleon fashion his professional standing and obligation and there is no just reason why he should be permitted to do so." *In re Carlsen*, 17 *N.J.* at 346. Generally, an attorney should refrain from engaging in a business transaction with a client who has not obtained independent legal advice on the matter. *In re Barrett*, 88 *N.J.* at 453. The reasoning for this proscription is obvious—the attorney's judgment can be impaired by his self-interest. In such a situation, a lawyer has a duty to explain carefully, clearly, and cogently why independent advice is needed. *In re Kamp*, 40 *N.J.* 588, 595 (1963). Here, respondent never even advised the other principals of the need to secure independent counsel. Accordingly, it is abundantly clear that respondent violated *DR* 5–104(A) when he entered into a business relationship with the other principals of Four Square.

More significantly, in dealing with Four Square and its stockholders, respondent acted with gross disregard for conflicts of interest. Throughout the Ethics Committee and DRB hearings, respondent characterized his relationship with the corporation and its principals in various ways: as attorney for Four Square; as attorney for his wife (one of the stockholders of Four Square); as a "business" partner of the other principals (although he had no equity interest); as an officer and director of the corporation; and as a creditor of the corporation. He never advised any of the parties about any actual or potential conflict of interest arising out of his various roles in the transaction. The evidence demonstrates clearly and convincingly that respondent in these multiple roles was guilty of multiple actual conflicts of interest.

In fostering these conflicts of interest, respondent violated both *DR* 5–101(A) and *DR* 5–105(A). *DR* 5–101(A) prohibits a lawyer from accepting employment when his or her own financial, business, property, or personal interests will or reasonably may affect his or her professional judgment on behalf of a client, unless after full disclosure the client consents. *DR*

5–105(A) bars a lawyer from accepting or continuing employment if his or her independent professional judgment will be or is likely to be adversely affected because of the interests of another client.

■ Respondent's actions in the Washington Township matter disclose a clear conflict between his being Four Square's attorney and his family's interest. It is undisputed that he was the attorney for Four Square in its application for the subdivision. Having undertaken this role, he violated his duties as attorney by filing an amended application listing Timberland and his wife's corporation as the successor-in-interest to Four Square.

Respondent's claim that he was merely acting as a businessman in the Washington Township transaction ignores that attorneys are held to a higher standard than that of the market place. An attorney's conduct must measure up to the high standards required of a member of the bar even if his duties in a particular transaction do not involve the practice of law. "He is bound even in the absence of the attorney-client relationship to a more rigid standard of conduct than required of laymen. To the public, he is a lawyer whether he acts in a representative capacity or otherwise." *In re Gavel*, 22 *N.J.* at 265. These principles have long been the lodestar guiding the actions of attorneys. *In re Suchanoff*, 93 *N.J.* 226, 230 (1983); *In re Franklin*, 71 *N.J.* 425, 429 (1976).

■ In addition to violating *DR* 5–101(A) and *DR* 5–105(A), respondent in his actions with respect to the Washington Township Application violated *DR* 7–101(A)(1), (2) and (3), which provide:

*DR* 7–101 Representing a Client Zealously.

(A) A lawyer shall not knowingly:

(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules ...

(2) Fail to carry out a contract of employment entered into with a client for professional services ...

(3) Prejudice or damage his client during the course of the professional relationship ...

■ Respondent likewise failed to perceive any conflict between being a corporation's attorney and being a creditor of the corporation. When the refund from Montvale came to Four Square, the respondent did not deposit the refund in the corporation's account but in his trust account. Then without specific authorization, he paid himself the $1,500 that he had lent to the corporation. Such conduct violated *DR* 5–101(A) and it likewise violated *DR* 9–102(B)(4), which provides that a lawyer shall promptly pay to the client the funds in his or her possession that the client is entitled to receive.

In short, respondent's actions in the *DiMaria/Four Square* matter displayed a cavalier insensitivity to conflicts of interest. He plainly put self-interest above the interests of his client, "to whom he owed complete and unfettered loyalty * * *." *In re Surgent,* 79 *N.J.* 529, 533 (1979).

### III

■ Respondent's conduct toward Mrs. Berman is even more egregious than his conduct in the Four Square matter. He again has shown a complete insensitivity to conflicts of interest. While continuing to represent his father-in-law's company, one of the two major creditors of Supro-Paint Corporation, he undertook to represent the debtor. That he made no explanation to Berman of any actual or potential conflicts of interest is clear from his testimony that everyone knew what the meeting was about.

We have held that:

[A]n attorney owes complete and undivided loyalty to the client who has retained him. The attorney should be able to advise the client in such a way as to protect the client's interests, utilizing his professional training, ability and judgment to the utmost. Consequently, if any conflicting interest could arise which would stand in the way of that kind of unstinting zeal, then the client must be so informed and the attorney may continue his limited representation only with the client's informed consent. . . .

> In a real estate transaction, the positions of vendor and purchaser are inherently susceptible to conflict. *In re Kamp*, 40 *N.J.* 588, 595 (1963). *This is likewise the case with a borrower-lender relationship. Id.* at 596.
> [*In re Dolan*, 76 *N.J.* 1, 9 (1978) (emphasis added).]

A lawyer who has a personal or economic stake in business dealings with a client loses that objectivity and ability to give the client undivided loyalty. *In re Wolk*, 82 *N.J.* 326, 333 (1980); *In re Kamp*, 40 *N.J.* at 596. In such a situation, the attorney must explain in detail the pitfalls that may arise in the course of the transaction which would make it desirable that the client have independent counsel.

█ Respondent acknowledges that while representing Berman and the Supro Corporations, he continued to represent Pur-All, his father-in-law's company and a major creditor of Supro Paint. The evidence is clear and convincing that respondent's representation of both creditor and debtor presented an actual conflict of interest. Further, the record discloses that despite his assurance to Berman to the contrary, he was in the transaction primarily to arrange the sale of the business so his father-in-law's company could be paid. His personal interests clearly interferred with the independent professional judgment that Berman as his client had every right to expect. Again, his conduct violated both *DR* 5–101(A) and *DR* 5–105(A).

█ There are other very disturbing aspects of respondent's handling of the Berman matter. His unauthorized deposit of the $50,000 into an account bearing his social security number placed these escrow funds at the peril of his creditors. He unscrupulously used his physical control of the $50,000 escrow fund as a lever with which to extract his fee. Hence, we find that his handling of the escrow account and refusal to turn over the $50,000 until the day of closing violated *DR* 9–102(A)(2) and *DR* 9–102(B)(4).

Equally disturbing, after Berman dismissed him, respondent commenced an action on behalf of Pur-All Paint Products against Supro-Paint and her personally for the collection of Supro's obligations to Pur-All Paint. As this Court noted in *In*

*re Blatt,* 42 *N.J.* 522, 524 (1964), "[i]t is self-evident that where a member of the bar represents a litigant in a cause, he should not thereafter represent the opposing party in any step in the proceedings in or arising out of the same cause." *See In re Garber,* 95 *N.J.* 597, 607 (1984); *In re Palmieri,* 76 *N.J.* 51, 63 (1978).

◼ Respondent's most disturbing action, however, was his filing of a self-serving affidavit submitted to the Superior Court to permit him to represent Pur-All in a suit filed by Supro-Paint. In his affidavit, he writes, "I was never retained to represent the plaintiff and in fact did not." The plaintiff referred to is Supro-Paint. The respondent stated that his only relationship with any corporation having the name Supro in it was his representation of Patricia Berman, a shareholder of Supro-Realty Co.

In its decision and recommendation, the DRB concluded with respect to the false certification: "In light of respondent's repeated statements (made in quest of his fee) that he represented Supro-Paint for at least six months, the certification was clearly a lie and constituted a fraud upon the court." Our review of the record confirms that the certification was a lie. "A lawyer has an obligation of being candid and fair with the Court. As an officer of the court, his duty can be no less." *In re Turner,* 83 *N.J.* 536, 539 (1980). In *In re Schleimer,* 78 *N.J.* 317, 319 (1978), we stated that the filing of a false certification to induce a court to grant relief for an attorney's benefit is conduct that goes "to the heart of every attorney's obligation to uphold and honor the law." There we imposed a one-year suspension for false swearing in a civil case. *See also In re Kushner,* 101 *N.J.* 397 (1985); *In re Rospond,* 87 *N.J.* 572 (1980) (involving convictions or guilty pleas pursuant to criminal statutes).

We conclude that by filing the false certification, respondent violated *DR* 7–102(A)(5), (6) and (7), which provide that a lawyer in his representation of a client shall not: (5) knowingly make a

false statement of law or fact; (6) participate in the creation or preservation of evidence when he believes that the evidence is false; (7) counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent. Respondent also violated *DR* 1–102(A)(4), which provides that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

In the Sammarco matter we conclude also that respondent was guilty of unethical conduct. He knew that the Sammarcos were represented by an attorney. And he had been a professional long enough to know that an attorney should never deal directly with another attorney's client. Moreover, the record supports the conclusion that respondent sought to intimidate the Sammarcos into giving his bill priority over their other obligations. Accordingly, we conclude that respondent violated *DR* 7–104(A)(1), which provides that during the course of his representation of a client a lawyer shall not communicate on the subject of the representation with a party he knows to be represented by an attorney.

Furthermore, our independent review of the record confirms that respondent's recordkeeping, his improper use of his trust account, and his commingling of trust and business expenses all violated *DR* 9–102(C) and Rule 1:21–6.

## IV

The DRB after the hearing concluded:

When viewed together, these incidents reflect Respondent's disregard for the integrity of the profession. He flagrantly and repeatedly violated his responsibilities to his clients by placing his personal interests first. His conduct adversely reflects on his fitness to practice law, *DR* 1–102(A)(6). These were not aberrational incidents, but were part of his method of operation. The public must be protected against this kind of unprofessionalism.

This strong language puts the matter well. Respondent's lack of understanding of his professional responsibilities is appalling. We therefore conclude that respondent should be suspended from the practice of law for one year. He is

directed to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For suspension*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

It is ORDERED that ARTHUR D. REISS of MONTVALE, who was admitted to the bar of this State in 1974, be suspended from the practice of law for a period of one year and until the further order of this Court, effective January 27, 1986; and it is further

ORDERED that ARTHUR D. REISS reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that ARTHUR D. REISS be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that ARTHUR D. REISS comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.