IN THE MATTER OF JOSEPH W. URBANICK, AN
ATTORNEY-AT-LAW.

Argued September 12, 1989—Decided December 1, 1989.

*William R. Wood,* Deputy Ethics Counsel, argued the cause
on behalf of the Office of Attorney Ethics.

*Stephen Horn,* a member of the Maryland bar, argued the
cause for respondent (*John A. Fenimore,* attorney).

PER CURIAM.

This matter emanates from a four count complaint filed by the District X Ethics Committee, which came on for hearing before Special Master Alexander P. Waugh, who sat in lieu of a hearing panel by designation of Chief Justice Wilentz. The Special Master found that respondent, Joseph W. Urbanick, had engaged in illegal conduct that adversely reflected on his fitness to practice law, DR 1–102(A)(3); conduct that involved dishonesty, fraud, deceit, or misrepresentation, DR 1–102(A)(4); and other conduct that adversely reflected on his fitness to practice law, DR 1–102(A)(6). Based on his findings, the Special Master recommended a temporary suspension of six to nine months. The Disciplinary Review Board (DRB) found "that the conclusions of the Special Master are fully supported by clear and convincing evidence." Concluding, however, that under the circumstances of the case suspension was not necessary, the DRB recommended a public reprimand. We agree.

–I–

Around 1975 respondent and his former law partner, Ivan White, became interested in real estate speculation. Together with a client, Thomas Ferguson, they formed several corporations, including Beacon Hill Estates, Inc. (Beacon Hill), which owned a tract in Washington Township known as Fairmount Farms. In its Decision and Recommendation, the DRB summarized the relevant facts:

> In order to finance the Beacon Hill Estates development, in February, 1979, Beacon Hill Estates, Inc., obtained a loan of $275,000 from Capital Savings and Loan Association. This loan was secured by mortgages on various lots, including lot 9–5. On or about February 22, 1979, American National Bank lent to the same principals $120,000 to finance the purchase and improvement of a tavern in Chester, New Jersey. American National Bank was granted a mortgage on both the Chester property and the Washington Township properties. The tavern was purchased by Chester Park Partnership, owned by Messrs. Ferguson and Urbanick, individually. Beacon Hill Estates, the owner of the Washington Township properties, received no consideration as a result of this mortgage. In addition, various lots in Washington Township were secured

by loans made by First National Bank of Northwest Jersey and Hudson United Bank.

During mid–1979, Paul and Anna Maioriello contacted Thomas Ferguson, Jr. and Joseph W. Urbanick, officers of Beacon Hill Estates, Inc., the builders of the Beacon Hill Estates development in Washington Township. The Maioriellos entered into a contract of sale on November 5, 1979, for the purchase of a residence to be constructed on Lot 9–5 in the Beacon Hill development, one of the lots secured by the Capital Savings & Loan funds. The contract was in the amount of $109,500. The Maioriellos were represented at the time by D. Joseph Mone, Esq., with respect to this transaction.

On or about December 3, 1979, the Maioriellos paid $1,000 to Beacon Hill Estates, Inc. as a binder, pursuant to the sales contract. This check was deposited on December 6, 1979, into Beacon Hill Estates, Inc.'s account with First National State Bank in Succasunna, New Jersey. In addition, pursuant to the contract, the closing was scheduled to take place at the offices of Urbanick and White, Esqs. in Gladstone, New Jersey, on June 1, 1980. The closing information contained in the contract made the Maioriellos aware that they were dealing with lawyers who were also developers/builders.

In January 1980, the Maioriellos obtained an equity loan on their existing home in the amount of $9,950. Again pursuant to their sales contract, this was paid to Beacon Hill Estates, Inc., as the balance of their deposit.

By the summer of 1979, however, the financial condition of Beacon Hill had deteriorated. As a result of this deteriorating financial condition, respondent's mother lent Beacon Hill money in late 1979. Respondent attempted to protect his mother by agreeing to transfer to her the liquor license associated with the Chester Tavern but held by another corporation of Respondent, Eleventh Hour, Inc., should the loan not be repaid within six months.

During late 1979, Hudson United Bank brought suit to foreclose on its various lots. The complaint was served upon all defendants, including respondent. At the same time, Hudson United Bank brought suit on a promissory note against various defendants, including respondent. As no answer to the complaint was filed, a final judgment by default was entered in the Law Division on January 10, 1980.

In an attempt to protect Beacon Hill Estates' property from the lending institution, in early 1980, Beacon Hill Estates, Inc. conveyed various lots, including that under contract to the Maioriellos, to a new entity entitled Five–Four–Five Development Corp. Respondent was listed as the registered agent for Five–Four–Five Development Corp. A portion of the Maioriello deposit was used to finance this real estate transfer.

In February or March 1980, the Maioriellos became concerned, as there had been no activity on their home. Although Mr. Maioriello made repeated attempts to contact respondent, these attempts were without success. According to Mr. Maioriello, respondent never responded to these telephone inquiries.

None of the seven homes contracted to be built by Beacon Hill Estates, Inc. between September 11, 1979 and November 5, 1979, was ever completed. The project was eventually subject to a series of foreclosures; as a result, purchas-

er deposits in the amount of $78,600 were lost. In April 1981, the Maioriellos filed a lawsuit for breach of contract, consumer fraud, and other relief against Beacon Hill Estates, Inc., and Messrs. Urbanick and Ferguson.

In June 1981, Joseph and Janet Urbanick filed a joint petition in bankruptcy. The Maioriellos thereafter sought to have their claim against respondent declared non-dischargeable, on the basis of fraud. On December 14, 1982, the Bankruptcy Court entered judgment in favor of the Maioriellos in the amount of $10,950 against respondent and designated this award non-dischargeable. Although Mr. Urbanick was present at the hearing on November 18, 1982, when his request for an adjournment was denied, he left the court. In addition, state court proceedings resulted in a judgment being entered, on July 30, 1984, against various defendants, including respondent. Judgment was entered in the sum of $12,220, which was trebled pursuant to the Consumer Fraud Act.

Due to an absence of corporate records for the various entities referred to earlier, the District X Ethics Committee engaged a certified public accountant, Lawrence Scheid, to reconstruct the expenditure of deposit monies received between the dates of September 29, 1979, and January 31, 1980. These were the deposits accepted from the Maioriellos and others whose contracts were not fulfilled. CPA Scheid found that deposits received between these dates resulted in payments by Beacon Hill to Ferguson, Inc. In addition, a payment was made by Ferguson, Inc. to Sandy Komits for roofing on the bar-restaurant owned by Chester Park, Inc. This payment, however, was traced by Mr. Scheid to a deposit made on a Beacon Hill property.

From the outset, Beacon Hill was heavily financed, and by the summer of 1979 it was in serious financial trouble. Its cash flow was minimal, and contracts had been signed for only eight of the twenty lots. Sales were so slow that Beacon Hill reduced the price of its lots to prevent a failure of the Fairmount Farms project, and contracts were signed for the sale of seven more lots. Because of the financial pressure on Beacon Hill, respondent arranged for a $25,000 loan to that corporation from his mother. The loan was secured by the liquor license for a tavern owned by Chester Park, a partnership comprised of respondent, White, and Thomas Ferguson. Title to the liquor license was in another of their corporations, Eleventh Hour, Inc. By November 5, 1979, when Beacon Hill signed a contract with the Maioriellos, respondent and his various corporations, including Beacon Hill, were in financial straits. As the Special Master found, "Beacon Hill desperately needed money in late 1979."

On that same date, November 5, 1979, Charter Savings and Loan filed a suit to foreclose on the lot containing the Fairmount Farms model home. Urbanick, however, knew the suit was imminent even before that date.

By Urbanick's own admission, when the Maioriellos paid a $1,000 deposit on December 3, 1979, Beacon Hill was in arrears on all of its land mortgages, was suffering worsening cash-flow problems, and had not obtained the construction financing needed to build the Maioriellos' home. Ferguson, Inc., to which respondent paid most of the Maioriellos' initial deposit on behalf of Beacon Hill, was also in dire straits. Its only backhoe was repossessed on December 7.

On January 10, 1980, Hudson United Bank obtained a default judgment for $90,083.33 against Beacon Hill on a construction loan and against respondent on his personal guarantee of that loan. Four days later the bank obtained a judgment of foreclosure for a lot mortgaged by Beacon Hill to secure the loan. One week later, on January 21, 1980, the Maioriellos paid to Beacon Hill an additional $9,950 deposit. Beacon Hill accepted the deposit without disclosing its precarious financial condition, the mortgage foreclosures, or anything else that might have alerted the Maioriellos to the risks to which their deposit was exposed. In fact, respondent paid portions of the deposit to Thomas Ferguson, personally, and to Chester Park. Respondent contends that these payments were made on behalf of Ferguson, Inc. for work previously done for Beacon Hill.

Beacon Hill's plight worsened, and in March 1980, it deeded its lots, including the Maioriellos' lot, to the Five–Four–Five Corp., another of respondent's corporations. The purpose of the transfer was to shield the lots from Beacon Hill's creditors. Respondent even used $751.75 of the Maioriellos' deposit to pay the realty transfer tax on the deed to Five–Four–Five Development Corp. This misuse of the deposit money contravenes *N.J.S.A.* 2A:29A–1, which requires generally that deposits on development homes be treated as trust funds to be used only

for the development of the tract.[1]  We are not persuaded by the contention of the Office of Attorney Ethics (OAE) that the sum is too modest to be legally significant or by respondent's contention that the misuse of funds was justifiable "to avoid unnecessarily entangling them [the Beacon Hill lots] in litigation and delaying home construction."

–II–

From the foregoing, the DRB concluded in part:

Upon a review of the full record, the Board is satisfied that the conclusions of the Special Master in finding respondent guilty of unethical conduct are fully supported by clear and convincing evidence.  With regard to the Maioriello deposit, respondent owed the Maioriellos a duty to utilize their deposit solely for the advancement of their property in the Beacon Hill Estates, Inc.  *See N.J.S.A.* 2A:29A–1.  In addition, respondent owed this duty to other parties who had deposited funds toward Beacon Hill properties.  While respondent may have made payments based on a belief that the Beacon Hill development would succeed, the money coming into Beacon Hill, Inc. was trust money under the statute.  *See N.J.S.A.* 2A:29A–1.  In addition, while respondent may have designed Five–Four–Five Development, Inc. to protect the Beacon Hill property from ongoing lawsuits, the money used to pay the realty transfer fee was clearly traced to deposits made on Beacon Hill properties.

In evaluating respondent's conduct, we recall that

[t]he conduct and the motive of attorneys must be such as to merit the approval of all just men.  They should strive at all times to uphold the honor and to maintain the dignity of the profession.

If an attorney wishes to be a business man as well as perform the precise functions of a lawyer, he must act in the transactions with the high standards of his profession and not with an "arm's length" and lapsable attitude.

[*In re Genser*, 15 *N.J.* 600, 606 (1954).]

---

[1]*N.J.S.A.* 2A:29A–1 provides that

[a]ll money paid as a deposit or advance by a person who has contracted or agreed to purchase a dwelling house to be constructed, shall constitute trust funds for the purpose of carrying out the provisions of said contract or agreement.  In any case in which more than 1 dwelling house is to be constructed as part of the development of a tract of land, said funds may be used in the development of said tracts of land.  Any use of said moneys, other than for the purpose of carrying out the provisions of said contract or agreement, shall constitute an unlawful diversion of trust funds.

■ Consistent with those precepts, we have held that a member of the bar should not act dishonorably in a business venture, even if such conduct comports with prevailing practices of the business world. *See In re Silverman,* 113 *N.J.* 193, 210 (1988); *In re Reiss,* 101 *N.J.* 475, 488 (1986); *In re Suchanoff,* 93 *N.J.* 226, 230 (1983); *In re Katz,* 90 *N.J.* 272, 284 (1982); *In re Lambert,* 79 *N.J.* 74, 77 (1979); *In re Franklin,* 71 *N.J.* 425, 429 (1976); *In re Gavel,* 22 *N.J.* 248, 265 (1956). That standard obtains even in the absence of an attorney-client relationship. *Silverman, supra,* 113 *N.J.* at 210; *Reiss, supra,* 101 *N.J.* at 488; *Franklin, supra,* 71 *N.J.* at 429; *Gavel, supra,* 22 *N.J.* at 265.

As this case illustrates, lawyers who embark on speculative business ventures expose themselves to risks not borne by members of the bar who confine themselves to the practice of law. We need not determine the low-water mark for non-lawyer businessmen to affirm that lawyers should be above-board in their business transactions. A lawyer who acts dishonestly discredits the reputation of all lawyers.

Respondent was a principal in several business entities, which in many respects he treated as one. As the Special Master observed, respondent's failure to keep specific records of corporate transactions increased the difficulty of ascertaining the relevant facts. The economic reality was that through Beacon Hill respondent was speculating in real estate development; that Ferguson performed construction work for Beacon Hill; and that through Chester Park respondent was speculating in the restaurant business. In late 1979, Beacon Hill, like Ferguson, Inc., was failing. Respondent, however, continued to accept deposits for the construction of homes that he knew or should have known would not be built. By statute, *N.J.S.A.* 2A:29A–1, those deposits were paid in trust for the development of the tract of which the homes were a part. Respondent then caused the deposits to be paid to his other business entities in an attempt to save them. The payment of $751.75 to respondent's law partner for realty transfer fees was clearly inappro-

priate. Moreover, in accepting the deposits, not only did respondent fail to protect or make adequate disclosure to the purchasers, but he took advantage of them. As a result, he exposed the deposits of purchasers, such as the Maioriellos, to extraordinary risks. It is fairly inferable that the Maioriellos could have protected themselves against those risks if respondent had told them about Beacon Hill's true financial condition and that he intended to pay their deposits to other failing business entities in which he had conflicting interests. In embarking on this course of conduct, respondent misperceived the duty of a lawyer acting as a businessman. His misconduct constitutes misrepresentation that reflects on his fitness to practice law. *See In re Katz, supra,* 90 *N.J.* at 284.

We conclude that respondent's conduct is inconsistent with the standards that we have traditionally expected of lawyers who engage in business apart from the practice of law. We find that respondent did not act fairly or honestly in his dealings with the Maioriellos. Failing to recognize the impropriety of respondent's conduct would be a disservice to the vast majority of lawyers who conduct themselves honorably in their professional and personal lives. Although respondent has a right to speculate in real estate, he should have been more candid with the Maioriellos. Had they known the true facts, they could have taken steps to protect themselves. Although it is not clear that the Maioriellos paid the $10,950 deposit in reliance on respondent's status as a lawyer, Mr. Maioriello testified that during

> the latter part of 1979, early part of 1980 * * * I came to look upon our transaction as being [a] very solid and very secure transaction based on the fact that, in fact, Mr. Urbanick was an attorney. I was under the impression that I was dealing with a very reputable person based on that.

Even if the Maioriellos did not pay respondent their deposit because he was a lawyer, his status induced them to trust him and to believe that the purchase was "very solid and very secure." In fact, the transaction was insecure and respondent's business ventures were on the verge of collapse. We agree

with the Special Master and the DRB that respondent's conduct violated *Disciplinary Rule* 1–102(A)(3), (4), and (6) (now *Rule of Professional Conduct* 8.4(b), (c)).

▮ In connection with another closing, the conveyance of block 59, lot 11 from Beacon Hill to Leo and Elaine Gerris, respondent executed on December 17, 1979, an affidavit of title on a printed legal form, in which he swore that "no proceedings in bankruptcy or insolvency, receivership or any other cause have ever been instituted by or against the corporation." In fact, at the time that respondent signed the affidavit, he was aware that in October 1979 Hudson United Bank had instituted a foreclosure proceeding affecting another lot in Fairmount Farms, block 59, lot 9–11. The Gerris closing was delayed until January 15, 1980. In the interim, on January 10, Hudson United took a default judgment against the other lot.

Because of the pendency of the foreclosure action at the time of the execution of the affidavit of title, the Special Master and the DRB found that respondent had signed a false affidavit. Both the OAE and respondent disagree. We are not satisfied that the clause requires disclosure of general litigation against the corporation. Neither of the Hudson United actions related to or affected the Gerris closing. Under these circumstances, we cannot find that the failure to disclose those actions constituted an ethical violation.

Turning to the nature and extent of discipline, the DRB was satisfied that respondent sincerely believed that his obligations as a businessman were separate and distinct from his obligations as an attorney. The Board disagrees, however, with respondent's conclusion in this regard. The Board entirely concurs with Judge Waugh's finding that respondent "... completely misperceived the New Jersey duty of a lawyer acting as a businessman in a transaction involving *N.J.S.A.* 2A:29A–1 and he did not consider his own conflict of interest in a division of the Beacon Hill deposits." While respondent's misbelief with regard to his responsibilities is not an excuse for his unethical conduct, *see In re Blasi,* 47 *N.J.* 447 (1966), the Board believes that the sincerity of his belief and his continued belief that the Beacon Hill Estates development would become viable do mitigate with regard to the punishment that should be imposed. As was found by Judge Waugh, the course respondent took "... was not with 'mens rea' to steal money."

The Board is also painfully mindful that more than eight years have passed since the unethical conduct occurred. Judge Waugh noted that even his findings were made over five years after the date the infractions took place. Mindful of the Court's holdings in *Matter of Kotok, supra* [108 *N.J.* 314] at 330 and *Matter of Stier*, 108 *N.J.* 455 (1987), the Board is compelled to consider the efficacy of any sanction in the light of the amount of time that has passed since the ethics violations occurred. As was observed in *Kotok*, "[i]f the ethics transgressions are remote in time, intervening developments and current circumstances may require an assessment of whether usual sanctions, otherwise appropriate, will effectively serve the purpose of discipline." Indeed, citing *Matter of Hinds*, 90 *N.J.* 604 (1982), the Court noted that, in special circumstances, it has permitted its written opinion determining wrongdoing to suffice as a form of discipline. In such cases, "... the particular disposition was adequate to protect the public, discourage future misconduct, and encourage the rehabilitation of the errant lawyer."

In addition, it appears that this is respondent's first disciplinary action. It involved a complex and unusual business transaction, such that the sincerity of respondent's belief that he was acting ethically appears genuine. In short, while respondent's conduct is not defensible, the Board finds that it may have been the result of poor business judgment and not any willful intent to defraud.

The Board notes that Judge Waugh has recommended that respondent be suspended for a term of from six to nine months. In reaching that conclusion, Judge Waugh observed that respondent already had "a fraud judgment against him" and "may be required to pay the cost of these proceedings." Certainly, the Board concludes that respondent must, in fact, pay the costs of these proceedings and those costs will be substantial. The Board does not, however, agree with Judge Waugh that the prior fraud judgment should be considered in mitigation. A fraud judgment should not be regarded as mitigating an ethical infraction.

In making its independent recommendation based upon its *de novo* review of the record below, the Board pays particular deference to the representation made by respondent's counsel at the time of oral argument that, in the many years since the transgressions took place, respondent has largely refrained from the active practice of law. At page 49 of the transcript of the record before this Board, in response to an inquiry by the Board chair, counsel observed that, in the intervening nine years since most of the unethical conduct occurred, respondent has not really practiced law. Instead, he has engaged in development work. In a plethora of cases, the Court has imposed discipline retroactively, indirectly crediting the attorney for periods of suspension already served. *See, e.g., Matter of Noonan*, 102 *N.J.* 157 (1986); *Matter of Verdiramo*, 96 *N.J.* 183 (1984); and *Matter of Strickland*, 87 *N.J.* 575 (1981). In this matter, the Board is satisfied that similar credit should be given to what apparently has amounted to respondent's *de facto* voluntary suspension.

Discipline should always be intended primarily to protect the public interest, but should also encourage the rehabilitation of the offending lawyer. Although the Board cannot condone respondent's past transgressions by ignoring them, the Board is satisfied that a term suspension should not be imposed in this case.

Under the circumstances of this case, we agree that a public reprimand is sufficient discipline.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

*For public reprimand*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

### ORDER

It is ORDERED that JOSEPH W. URBANICK of LEBANON, who was admitted to the Bar of this State in 1971, be and hereby is publicly reprimanded for misconduct constituting misrepresentation that reflects on his fitness to practice law, in violation of *DR* 1–102(A)(3), (4) and (6); and it is further

ORDERED that JOSEPH W. URBANICK reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.